[915 NYS2d 514]

Joseph W. Sullivan, Respondent, v William F. Harnisch et al., Appellants.

First Department, December 21, 2010

## APPEARANCES OF COUNSEL

*Fulbright & Jaworski LLP*, New York City (*James Nespole* and *Neil G. Sparber* of counsel), for appellants.

*Sklover Donath & Felber, LLC*, New York City (*Daniel M. Felber* and *Benjamin N. Leftin* of counsel), for respondent.

## OPINION OF THE COURT

NARDELLI, J.

The principal issue before us is whether an exception to the employment-at-will doctrine should be made for an employee who claims that his discharge violated his firm's Code of Ethics, because his superior retaliated against him for his internal inquiries into the superior's illegal trading activity. We hold that in this case such an exception does not exist and, in the absence of a specific contractual provision protecting plaintiff from termination, those causes of action which are founded on his claim that he had an implicit contractual right not to be fired should be dismissed.

The corporate defendants, Peconic Partners LLC and Peconic Asset Managers LLC (Peconic), are institutional investment managers and registered investment advisors. Defendant William F. Harnisch is the majority owner and president of both companies, and maintains full management control over them. The business of Peconic is subject to the oversight of the United States Securities and Exchange Commission (SEC). Between September 28, 2008 and October 13, 2008, plaintiff Joseph Sullivan was Peconic's chief compliance officer (CCO) and chief operating officer, and held a 15% ownership interest in Peconic.

As mandated by, inter alia, 17 CFR 275.206(4)-7, Peconic maintains a written Code of Ethics which all its employees are required to follow. Section I.2 of the Code requires the CCO, "on pains of termination," to "determine" when alerted, whether an employee or member of Peconic has engaged in any Code violation.

Peconic also discloses to its current and prospective clients, and files with the SEC, a document entitled Part II Form ADV, which, inter alia, outlines what controls are in place to ensure compliance with state and federal rules and regulations.

Peconic employees are permitted to maintain and manage proprietary securities accounts. All employees, however, are

required to obtain consent from the CCO before engaging in any trades on their own behalf. Proprietary trading is further restricted by the Form ADV and Code restrictions on taking advantage of investment opportunities that should first be accorded to clients.

Peconic had staked large sums of its investors' capital on the fertilizer industry, mostly with Potash Corp. of Saskatchewan, Inc. and a related company, Mosaic Corp. Prior to September 2008, Harnisch personally held over $100 million in Potash stock, and his clients held approximately $60 million worth of the same stock.

On September 29 and 30, 2008, Harnisch sold two thirds (784,085 shares) of his Potash shares at $132 per share, without either preclearing the trades with Sullivan or notifying Peconic clients who owned holdings in Potash. Also, allegedly in violation of Form ADV and the Code, these actions were taken without Harnisch making similar trades for the firms' clients. Upon learning of the sales, Sullivan blocked the October purchase of Potash shares with new client investment monies until he could determine why Harnisch had sold from his own accounts and not for Peconic clients.

On October 1, 2008, Mosaic released a disappointing third-quarter earnings report. By the market opening on the next day, its stock price had dropped more than 15%. On October 2, 2008, Peconic sold half of the shares of Potash stock held in client accounts (230,000 shares) at an average price of $103 per share. Peconic's clients were estimated to have lost $6,670,000 by not having their Potash stock sold at the same time that Harnisch sold his personal Potash shares. Harnisch thereafter sold the remaining shares of Potash held in his personal accounts (243,900 shares) on October 6, 2008 without selling any of the remaining 229,965 shares of Peconic's clients' Potash stock.

Sullivan claims that after reviewing Harnisch's September 29 and 30 Potash sales against Peconic's October 2 trading activity on behalf of clients, he believed, in his professional judgment, that Harnisch had engaged in "front-running," a practice specifically forbidden by Peconic's SEC Form ADV and its Code, as well as its Compliance Manual.

On October 6, 7 and 8, 2008, Sullivan questioned Harnisch about the apparent front-running, and Harnisch allegedly refused to provide Sullivan with any explanation. On October 10, 2008, when all the data necessary to complete the review of

the Potash trades would have become available, Harnisch, according to the complaint, summarily terminated the employment of Sullivan and nonparty Daniel Otmar, the deputy compliance officer; wiped out all of Sullivan's computer data, including Peconic's trading logs; and expelled Sullivan from Peconic's partnership. I note that Sullivan does not allege that he made any complaint to the SEC or any other government agency.

Sullivan commenced this action on November 10, 2008, alleging a claim for retaliatory firing as well as claims regarding defendants' refusal to pay Sullivan the value of his ownership interest in Peconic. Included in the original complaint were the names of four corporate investors set forth as part of the allegations that Harnisch had breached his fiduciary duty to the Peconic clients by his September 29 and 30 Potash trades. After the original complaint was filed, copies were released to the media. Defendants subsequently moved to strike the names of the clients, and the motion was granted in an order entered February 6, 2009. The court specifically stated, in relevant part, "The information is prejudicial as there is no denial that Peconic's client information is deemed confidential and protected by the Peconic companies."

Sullivan filed an amended complaint on March 10, 2009, which asserted nine causes of action, only five of which are relevant to the appeal. They are breach of implied contract of employment (second), tortious interference with Sullivan's contractual relationship with Peconic and third parties (third), fraud (fourth), conspiracy to defraud (fifth) and breach of fiduciary duties (eighth).

In their answer defendants alleged 10 counterclaims, only one of which is at issue on the appeal. In the first counterclaim, defendants alleged that plaintiff had damaged defendants because Sullivan's complaint had identified certain clients in violation of Sullivan's continuing obligation of confidentiality, and then Sullivan disseminated the complaint publicly. Certain of those clients, it is alleged, subsequently withdrew their funds from Peconic accounts.

After cross motions to dismiss certain of the causes of action and the counterclaims, the court dismissed the first counterclaim, and denied defendants' motion to dismiss the five causes of action at issue on the appeal.

While acknowledging an employer's right to terminate an at-will employee under normal circumstances, the court found that, at this prediscovery stage, an "express limitation" to the

at-will discharge rule may result from the language found both in the Peconic handbook prohibiting retaliation, and also from the Code language specifically requiring the CCO to report complaints to the SEC. We find that nothing in the record supports the validity of the claim for breach of an implied contract.

It is axiomatic in New York that "where an employment is for an indefinite term it is presumed to be a hiring at will which may be freely terminated by either party at any time for any reason or even for no reason" (*Wieder v Skala*, 80 NY2d 628, 633 [1992], quoting *Murphy v American Home Prods. Corp.*, 58 NY2d 293, 300 [1983]). "[A]bsent a constitutionally impermissible purpose, a statutory proscription, or an express limitation in the individual contract of employment, an employer's right at any time to terminate an employment at will remains unimpaired" (*Murphy*, 58 NY2d at 305).

The Peconic Code of Ethics requires that each person report to the CCO all purchases and sales of any security in which the person has any beneficial interest, and requires that each employee preclear trades with the CCO. Additionally, the Code (as well as the Form ADV) requires the CCO to report to the chief operating officer and the president, following the receipt of any employee trading information, any apparent violation of the reporting requirements of the Code.

As hard as the result may seem, however, nothing in either document protects the CCO from being terminated, even though the Code authorized Sullivan to make his complaint to the SEC. As has been observed, courts should not "infer a contractual limitation on the employer's right to terminate an at-will employment absent an express agreement to that effect which is relied upon by the employee" (*Chazen v Person/Wolisky, Inc.*, 309 AD2d 889, 890 [2003], quoting *Doynow v Nynex Publ. Co.*, 202 AD2d 388, 388 [1994]).

In *Weiner v McGraw-Hill, Inc.* (57 NY2d 458 [1982]), the Court of Appeals found that a cause of action for breach of an employment contract was sufficiently stated by a security guard who was able to point to specific language in the employee handbook which stated that the employer would "resort to dismissal for just and sufficient cause only, and only after all practical steps toward rehabilitation or salvage of the employee have been taken and failed" (*id.* at 460).

On the other hand, four months later in *Murphy v American Home Prods. Corp.*, the Court of Appeals rejected the claim of a discharged, at-will employee who had reported accounting

improprieties but who was relying only on an implied covenant of good faith to support his breach of contract claim (58 NY2d at 304-305). The Court made clear that it believed that any changes in what it viewed as a public policy matter should be made by the Legislature (*id.* at 301-302).

The at-will doctrine was reaffirmed in *Sabetay v Sterling Drug* (69 NY2d 329 [1987]). There, the plaintiff had refused to participate in illegal activities and was terminated. He argued that since the personnel manual enumerated seven grounds for termination, and also required an employee to refrain from illegal and unethical activity, there was an implied promise that he could not be terminated for any other grounds. The Court held that since there was no express limitation on the employer's unfettered right to terminate at will, all the breach of contract causes of action had to be dismissed. The Court observed that statements in the manual and employment application requiring employees to adhere to company rules "merely suggest standards set by [the employer] for its employees' performance of their duties that, without more, cannot be actionable" (*id.* at 336).

The only retreat from the employment-at-will doctrine by the Court of Appeals was reached in *Wieder v Skala* (80 NY2d 628 [1992], *supra*), a case that is sui generis. In *Wieder* an associate at a law firm claimed that he had been discharged for insisting that the firm report unethical conduct of another associate at the same firm, which conduct included numerous misrepresentations and acts of malpractice against clients and acts of forgery of checks drawn on the firm's account. The court held that Wieder had stated a valid claim for breach of contract based upon an implied-in-law obligation in his relationship with the law firm. It reasoned that intrinsic to the relationship between Wieder and the law firm was an unstated but essential compact that in conducting the firm's legal practice, both Wieder and the firm would do so in compliance with the prevailing rules of conduct and ethical standards of the legal profession. The firm's insistence that Wieder, as an associate in its employ, act unethically and in violation of Code of Professional Responsibility DR 1-103 (A) amounted to nothing less than a frustration of the only legitimate purpose of the employment relationship:

> "[I]n any hiring of an attorney as an associate to practice law with a firm there is implied an understanding so fundamental to the relationship and essential to its purpose as to require no expression:

that both the associate and the firm in conducting the practice will do so in accordance with the ethical standards of the profession. Erecting or countenancing disincentives to compliance with the applicable rules of professional conduct, plaintiff contends, would subvert the central professional purpose of his relationship with the firm—the lawful and ethical practice of law" (*id.* at 635-636).

As noted by defendants, *Wieder* has not been applied to a business or profession other than the practice of law (*see e.g. Haviland v Aron & Co.*, 212 AD2d 439, 440-441 [1995], *lv denied* 85 NY2d 810 [1995] [plaintiff, who claimed to have been fired for refusing to breach confidentiality of clients, was hired as a broker and not a lawyer, and any services rendered to employer were not sufficient to bring claim within narrow exception of *Wieder*]; *see also Horn v New York Times*, 100 NY2d 85 [2003] [plaintiff physician's duties as associate medical director arose not solely from her knowledge as a physician, but also in furtherance of her responsibilities as part of corporate management]).

Indeed, we have in the past specifically declined to extend the *Wieder* exception to an auditor employed by a brokerage house (*see Mulder v Donaldson, Lufkin & Jenrette*, 208 AD2d 301 [1995]). In *Mulder*, the Court noted that *Wieder* was grounded in the "unique characteristics of the legal profession" (208 AD2d at 306), although it did leave open the potential for a cause of action for breach of express contract based upon a provision in the defendant's employment manual which specifically provided that an employee who reports wrongdoing "will be protected against reprisals" (*id.* at 307). As noted above, however, such language, express or otherwise, does not appear in the Peconic handbook.

Thus, the second cause of action for breach of implied contract should have been dismissed, since it is founded on the erroneous premise that the company "speak-out" policy itself protects an at-will employee such as Sullivan. Notwithstanding his employment responsibilities, and the conflict posed, he did not have either an express or implied right to continued employment. While some may disagree, absent extension of the *Wieder* exception by the Court of Appeals, or action by the Legislature, the existing precedent mandates this result.

■ The third cause of action for tortious interference with advantageous and prospective advantageous business relations

alleges that by terminating Sullivan and by threatening parties that do business with Peconic, Harnisch interfered with Sullivan's relations with Peconic, as well as with the third parties. The language of the cause of action appears to suggest that the business relations with Peconic encompassed not only Sullivan's employment with Peconic, but also his ownership interest in the company. To the extent the third cause of action asserts claims concerning the ownership interest, as well as claims concerning the alleged interference with other third parties, it is permitted to stand. Any claims, however, for damages based on loss of employment cannot be sustained.

We also find that the court did not err in refusing to dismiss the fourth, fifth and eighth causes of action for fraud, conspiracy to defraud, and breach of fiduciary duty, respectively. Defendants argue these claims are but an alternative way for plaintiff to plead his meritless claim of wrongful discharge. They take note of case law which holds that the employment-at-will doctrine "cannot be circumvented by casting the cause of action in terms of tortious interference with employment" (see *Barcellos v Robbins*, 50 AD3d 934, 935 [2008], *lv denied* 11 NY3d 705 [2008]).

Yet, these three causes of action allege more than conduct resulting in the wrongful termination of Sullivan's employment. In the fourth cause of action for fraud or attempted fraud, for instance, Sullivan alleges, inter alia, that defendants represented that he was a 15% owner of Peconic and was entitled to $33^1/_3$% of the profits, but that defendants never intended to provide him with his entitlement.

Likewise, in the fifth cause of action, Sullivan alleged that defendants conspired to defraud him of his ownership and management of the companies (as well as his employment and career). In the eighth cause of action, Sullivan alleged that Harnisch breached his fiduciary duties to Sullivan, a co-member of the limited liability companies, by expelling Sullivan and, inter alia, denying him his share of due profits and ownership interests.

Thus, all three of these causes of action seek recompense for property rights that arise, at least in part, from something other than a claim for wrongful discharge, and should not be dismissed. To the extent they raise such claims, they remain viable, but we caution that any claims relying on the argument that Sullivan was wrongfully discharged cannot be entertained. We make no determination as to the merit of the claims, and note that the only argument presently advanced by defendants

for their dismissal is that they are attempts to circumvent the prohibition against claims for wrongful discharge (*see e.g. Ullmann v Norma Kamali, Inc.*, 207 AD2d 691, 692 [1994]).

■ Finally, the court erred in dismissing the first counterclaim. In granting that part of the motion, it observed that Sullivan was an at-will employee and that fiduciary duties do not exist between an employer and an at-will employee. The court further held that defendants "failed to allege a binding confidentiality agreement." This determination was inconsistent with its prior order in which it found that Peconic's client information was confidential, and directed that the names of the clients should be stricken from the complaint. On this record, it was premature to determine that the obligation to keep the identities confidential did not apply to an at-will employee, especially in view of the confidentiality provision of the firm's Code of Ethics, which appears to apply to all employees, and which specifically recites, "Client and Client account information is also confidential and must not be discussed with any individual whose responsibilities do not require knowledge of such information."

Accordingly, the orders of the Supreme Court, New York County (Richard B. Lowe, III, J.), entered March 8, 2010, which, to the extent appealed from, denied defendants' motion for summary judgment dismissing plaintiff's second, third, fourth, fifth, and eighth causes of action and granted plaintiff's motion pursuant to CPLR 3211 (a) (7) to dismiss defendants' first counterclaim, should be unanimously modified, on the law, to the extent of granting defendants' motion to dismiss the second cause of action, and denying plaintiff's motion to dismiss the first counterclaim, and otherwise affirmed, without costs.

SAXE, J.P., FRIEDMAN, MOSKOWITZ and RICHTER, JJ., concur.

Orders, Supreme Court, New York County, entered March 8, 2010, modified, on the law, to the extent of granting defendants' motion to dismiss the second cause of action, and denying plaintiff's motion to dismiss the first counterclaim, and otherwise affirmed, without costs.