[969 NE2d 758, 946 NYS2d 540]

Joseph W. Sullivan, Appellant, v William F. Harnisch et al., Respondents.

Argued March 22, 2012; decided May 8, 2012

## POINTS OF COUNSEL

*The Law Offices of Daniel Felber,* New York City (*Daniel M. Felber* and *Benjamin N. Leftin* of counsel), for appellant. I. This Court's *Wieder/Horn* doctrine mandates a case-by-case analysis to determine whether the employment relationship under consideration includes an implied-in-law exception to the at-will doctrine. (*Wieder v Skala,* 80 NY2d 628; *Martin v New York Life Ins. Co.,* 148 NY 117; *Rooney v Tyson,* 91 NY2d 685; *Wakefield v Northern Telecom, Inc.,* 769 F2d 109; *Matter of Starishevsky v Hofstra Univ.,* 161 Misc 2d 137; *Bi-Economy Mkt., Inc. v Harleysville Ins. Co. of N.Y.,* 10 NY3d 187; *City of New York v Pennsylvania R.R. Co.,* 37 NY2d 298; *Metro Kitchenworks Sales, LLC v Continental Cabinets, LLC,* 31 AD3d 722; *Mohawk Maintenance Co. v Kessler,* 52 NY2d 276; *Diamore Realty Corp. v Stern,* 50 AD3d 621.) II. Appellant, as the Chief Compliance Officer of a registered investment adviser, has stated a valid claim for breach of implied contract under the *Wieder/Horn* implied-in-law exception to the at-will employment doctrine. (*Wieder v Skala,* 80 NY2d 628; *Horn v New York Times,* 100 NY2d 85.)

*Morrison Cohen LLP,* New York City (*Y. David Scharf, Danielle C. Lesser* and *David C. Pollack* of counsel), and *Fulbright & Jaworski L.L.P.* (*Neil G. Sparber* and *Samantha E. Beltre* of counsel) for respondents. I. The First Department correctly held that Joseph W. Sullivan's claim is precluded for lack of any constitutional, statutory, or contractual basis. (*Murphy v American Home Prods. Corp.,* 58 NY2d 293; *Martin v New York Life Ins. Co.,* 148 NY 117; *Smalley v Dreyfus Corp.,* 10 NY3d 55; *Horn v New York Times,* 100 NY2d 85; *Sabetay v Sterling Drug,* 69 NY2d 329; *Trakis v Manhattanville Coll.,* 51 AD3d 778; *Haviland v Aron & Co.,* 212 AD2d 439, 85 NY2d 810; *Stevens v New York,* 691 F Supp 2d 392; *Lobosco v New York Tel. Co./NYNEX,* 96 NY2d 312; *Fraser v Fiduciary Trust Co. Intl.,* 417 F Supp 2d

310.) II. The First Department properly held that the "very narrow" exception to the at-will doctrine established in *Wieder v Skala* (80 NY2d 628 [1992]) and explicitly restricted to the facts in *Horn v New York Times* (100 NY2d 85 [2003]) cannot save Mr. Sullivan. (*Haviland v Aron & Co.*, 212 AD2d 439; *Slue v New York Univ. Med. Ctr.*, 409 F Supp 2d 349; *Gambello v Time Warner Communications, Inc.*, 186 F Supp 2d 209; *Smith v AVSC Intl., Inc.*, 148 F Supp 2d 302; *People ex rel. Karlin v Culkin*, 248 NY 465.) III. This Court should not alter the well-established law and public policy in New York to create a cause of action for Mr. Sullivan. (*Murphy v American Home Prods. Corp.*, 58 NY2d 293; *Sabetay v Sterling Drug*, 69 NY2d 329; *Horn v New York Times*, 100 NY2d 85; *Leibowitz v Bank Leumi Trust Co. of N.Y.*, 152 AD2d 169; *Szaller v American Natl. Red Cross*, 293 F3d 148; *Wieder v Skala*, 80 NY2d 628; *Oakley v May Dept. Stores Co.*, 17 F Supp 2d 533.)

**OPINION OF THE COURT**

SMITH, J.

We held in *Murphy v American Home Prods. Corp.* (58 NY2d 293 [1983]), and have several times reaffirmed, that New York common law does not recognize a cause of action for the wrongful discharge of an at-will employee. We decline in this case to make an exception to that rule for the compliance officer of a hedge fund.

I

Plaintiff, Joseph Sullivan, was, according to his complaint, a 15% partner in two affiliated firms, defendants Peconic Partners LLC and Peconic Asset Managers LLC (collectively called Peconic, and colloquially referred to as a hedge fund). He was also, the complaint alleges, Peconic's "Executive Vice President, Treasurer, Secretary, Chief Operating Officer and Chief Compliance Officer." Defendant William Harnisch was the majority owner, Chief Executive Officer and President.

Sullivan was fired after a dispute with Harnisch. The dispute was in part about money: the complaint alleges that the dismissal occurred within hours after a lawyer for Sullivan contacted Peconic's counsel to voice objections to a proposed agreement that would have eliminated Sullivan's ownership interest. The complaint also alleges, however, that there was another motive for the dismissal that is more relevant to this appeal: objections raised by Sullivan, in his capacity as Chief

Compliance Officer, to certain sales of stock by Harnisch for his personal account and the accounts of members of his family.

According to the complaint, these stock sales amounted to "front-running"—selling in anticipation of transactions by the firm's clients—and enabled Harnisch to take advantage of an opportunity from which the clients were excluded. The complaint alleges that Sullivan "confronted" Harnisch about these improper trades, "voiced objection to them, and insisted that they be reversed or otherwise properly addressed." Harnisch refused, and yelled at Sullivan for raising the subject. Sullivan was fired days later.

Sullivan asserted nine causes of action against Harnisch and Peconic, of which only one is now before us. That claim says that Sullivan was fired because he "spoke out" about "manipulative and deceptive trading practices," and that his dismissal violated "a company policy to prohibit retaliation" for such conduct. The complaint, however, does not identify any statement of this "company policy"; it infers the existence of the policy from Peconic's obligations under the securities laws and the firm's own Code of Ethics to avoid improper transactions, and from Sullivan's duty as Chief Compliance Officer to see that those obligations were performed. The gist of Sullivan's claim is that the legal and ethical duties of a securities firm and its compliance officer justify recognizing a cause of action for damages when the compliance officer is fired for objecting to misconduct.

On defendants' motion for summary judgment, Supreme Court held this claim to be legally sufficient, but the Appellate Division reversed and dismissed the claim (*Sullivan v Harnisch*, 81 AD3d 117 [1st Dept 2010]). The Appellate Division granted leave to appeal, and we now affirm.

## II

*Murphy* held that, absent violation of a constitutional requirement, statute or contract, "an employer's right at any time to terminate an employment at will remains unimpaired" (58 NY2d at 305). In *Murphy*, we applied that rule to dismiss the claim of a plaintiff who said he was fired "because of his disclosure to top management of alleged accounting improprieties on the part of corporate personnel" (*id.* at 297-298). We reached similar results in *Sabetay v Sterling Drug* (69 NY2d 329, 332 [1987]), where the plaintiff claimed "that he was discharged because he refused to participate" in illegal conduct

including "tax avoidance schemes and maintenance of slush funds," and in *Horn v New York Times* (100 NY2d 85 [2003]), where a doctor claimed that she was fired for refusing to violate patient confidentiality. Plaintiff's claim here is also barred unless something in this case justifies an exception to the rule we stated in *Murphy*.

In general, as we pointed out in *Horn*, American courts, including our own, "have proved chary of creating common-law exceptions to the rule and reluctant to expand any exceptions once fashioned" (*id.* at 91). Indeed, we have recognized an exception only once, in *Wieder v Skala* (80 NY2d 628 [1992]). The plaintiff in *Wieder* was a lawyer who claimed to have been dismissed by his law firm "because of his insistence that the firm comply with the governing disciplinary rules by reporting professional misconduct" committed by one of the plaintiff's colleagues (*id.* at 631). We held his claim good against a motion to dismiss, in an opinion that stressed both the ethical obligations of members of the bar and the importance of those obligations to the employment relationship between a lawyer and a law firm. We said:

> "[P]laintiff's performance of professional services for the firm's clients as a duly admitted member of the Bar was at the very core and, indeed, the only purpose of his association with defendants. . . . [P]laintiff's duties and responsibilities as a lawyer and as an associate of the firm were so closely linked as to be incapable of separation. It is in this distinctive relationship between a law firm and a lawyer hired as an associate that plaintiff finds the implied-in-law obligation on which he founds his claim.

> "We agree with plaintiff that in any hiring of an attorney as an associate to practice law with a firm there is implied an understanding so fundamental to the relationship and essential to its purpose as to require no expression: that both the associate and the firm in conducting the practice will do so in accordance with the ethical standards of the profession" (80 NY2d at 635-636).

We also referred in the *Wieder* opinion to "the unique function of self-regulation belonging to the legal profession" (*id.* at 636), and said that

> "these unique characteristics of the legal profession in respect to this core Disciplinary Rule make the

relationship of an associate to a law firm employer intrinsically different from that of the financial managers to the corporate employers in *Murphy* and *Sabetay*" (*id.* at 637).

It is obvious from the quoted language that we intended the exception to the at-will doctrine we recognized in *Wieder* to be a narrow one. The Appellate Division in this case said that *Wieder* is "sui generis" (81 AD3d at 123), but we do not need to go that far to decide this case. Assuming that there are some employment relationships, other than those between a lawyer and a law firm, that might fit within the *Wieder* exception, the relationship in this case is not one of them.

Sullivan stresses the importance of compliance officers in the overall scheme of federal securities regulation to which the two Peconic firms, registered investment advisers, are subject. The Securities and Exchange Commission (SEC) has found that "it is critically important for funds and advisers to have strong systems of controls in place" (Final Rule: Compliance Programs of Investment Companies and Investment Advisers, SEC Release Nos. IA-2204, IC-26299, § I, available at http://www.sec.gov/rules/final/ia-2204.htm), and requires each registered adviser to designate a chief compliance officer who will be responsible for administering policies and procedures designed to prevent violations of federal law and regulations (17 CFR 275.206[4]-7 [a], [c]). From this, Sullivan reasons that compliance with securities laws was central to his relationship with Peconic in the same way that ethical behavior as a lawyer was central in *Wieder* to the plaintiff's employment at a law firm. But the analogy fails.

Important as regulatory compliance is, it cannot be said of Sullivan, as we said of the plaintiff in *Wieder*, that his regulatory and ethical obligations and his duties as an employee "were so closely linked as to be incapable of separation" (*Wieder*, 80 NY2d at 635). Sullivan was not associated with other compliance officers in a firm where all were subject to self-regulation as members of a common profession. Indeed, Sullivan was not even a full-time compliance officer. He had four other titles at Peconic, including Executive Vice-President and Chief Operating Officer, and was, according to his claim, a 15% partner in the business. It is simply not true that regulatory compliance, in the words of *Wieder*, "was at the very core and, indeed, the only purpose" of Sullivan's employment.

It is beyond dispute that compliance with extensive federal regulations—overseen, at firms like Peconic, by compliance officers—is an integral part of the securities business. But the existence of federal regulation furnishes no reason to make state common law governing the employer-employee relationship more intrusive. Congress can regulate that relationship itself, to the extent that it thinks the objectives of federal law require it. Indeed, after the events involved in this case, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act (Pub L 111-203, 124 Stat 1376 [2010], codified at various sections of United States Code), which provides whistleblower protection, including a private right of action for double back pay, for employees who are fired for furnishing information about violations of the securities laws to the SEC (Dodd-Frank Act § 922 [a], 15 USC § 78u-6). That statute seems not to apply to conduct like that alleged in Sullivan's complaint; Sullivan does not claim to have blown a whistle—i.e., to have told the SEC or anyone else outside Peconic about Harnisch's alleged misconduct—but only to have confronted Harnisch himself. Nothing in federal law persuades us that we should change our own law to create a remedy where Congress did not.

Accordingly, the order of the Appellate Division should be affirmed with costs, and the certified question answered in the affirmative.

Chief JUDGE LIPPMAN (dissenting). In the wake of the devastation caused by fraudulent financial schemes—such as the Madoff ponzi operation, infamous for many reasons including the length of time during which it continued undetected—the courts can ill afford to turn a blind eye to the potential for abuses that may be committed by unscrupulous financial services companies in violation of the public trust and the law. In the absence of conscientious efforts by those insiders entrusted to report and prevent such abuses of investors, such behavior can run rampant until a third party outside the company discovers it and takes action. The message that will be taken from the majority's decision is self-evident: if compliance officers (and others similarly situated) wish to keep their jobs, they should keep their heads down and ignore good-faith suspicions or evidence they may have that their employers have engaged in illegal and unethical behavior, even where such violations could cause or have caused staggering losses to their employers' clients. The majority's conclusion that an investment adviser like defendant Peconic has every right to fire its compliance officer, simply for

doing his job, flies in the face of what we have learned from the Madoff debacle, runs counter to the letter and spirit of this Court's precedent, and facilitates the perpetration of frauds on the public.

Because the majority unduly narrows the scope of a purposefully and carefully crafted exception to the doctrine of at-will employment, and unfathomably permits the termination of a hedge fund's chief and deputy chief compliance officers in the midst of their investigation of the CEO's allegedly "manipulative and deceptive trading practices that include[d] illegal 'front-running' in violation of federal and state securities laws,"[1] I respectfully dissent.

The majority concedes that "there are some employment relationships, other than those between a lawyer and a law firm, that might fit within the *Wieder* exception" (majority op at 264), but erroneously concludes that such a relationship did not exist in this case. Nevertheless, the decision of the Court undermines the exception to the at-will employment doctrine (as recognized in *Wieder v Skala*, 80 NY2d 628 [1992], and reaffirmed in *Horn v New York Times*, 100 NY2d 85 [2003]), by excluding arbitrarily hedge fund compliance officers from the protections extended to lawyers working in law firms. In so doing, hedge fund managers are given carte blanche to terminate the very employees who are charged with the critical statutorily mandated role[2] of ensuring adherence to ethical and legal obligations, for doing the jobs they were hired to do. These protections must exist not only to decrease the likelihood that such employees will succumb to pressures to ignore or violate their obligations for fear of termination, but also to protect the public.

Our decisions in *Wieder* and *Horn* provide guideposts for determining whether an employment relationship falls within

---

1. This allegation is included in Sullivan's complaint. Sullivan also alleges that he relied on and was bound by Peconic's internal code of ethics when he "refus[ed] to engage in securities violations" and instead chose to speak out about certain trades he alleges were "improper [and] apparently illegal." Specifically, the complaint alleges that by making these trades, Harnisch violated a provision in the code of ethics prohibiting Peconic from " 'taking advantage of investment opportunities belonging to a client without recommending or effecting a suitable transaction in that security for the client.' "

2. Pursuant to 17 CFR 275.206(4)-7 (a), (c), a registered investment adviser must designate a chief compliance officer.

the exception to the general rule.[3] As applied to plaintiff Sullivan, chief among these considerations are that his sole function as compliance officer was to ensure compliance with the applicable internal and external ethical and legal requirements, his employer was bound by the same obligations, and his job as a compliance officer entailed fundamental self-regulatory functions.

In *Wieder*, we held that the plaintiff law firm associate's "central professional purpose" for associating with the employer was "the lawful and ethical practice of law" (*Wieder*, 80 NY2d at 636). Sullivan's central purpose as a compliance officer was to ensure that his employer adhered to the regulations governing hedge funds. In other words, it was Sullivan's responsibility to make certain that Peconic engaged in the lawful and ethical provision of investment adviser services.

As the Supreme Court correctly reasoned below in this case, "Sullivan and [Peconic] were engaged in a 'common professional enterprise' and 'were mutually bound to follow' both the Code [of Ethics] and any federal or state securities laws at issue." Sullivan's position is comparable to that of the plaintiff lawyer in *Wieder* and in stark contrast to that of the plaintiff doctor in *Horn*, who was not covered by the *Wieder* exception, in part because while as a physician she had certain obligations to the New York Times employees with whom she interacted, those obligations were not shared by her non-medical employer. Here, Sullivan and his employer shared certain fundamental ethical and legal responsibilities that they were bound to respect in their dealings with and on behalf of Peconic's clients.

Just as the plaintiff in *Wieder* was engaged in a self-regulating profession, the practice of law, Sullivan's job responsibilities at Peconic involved substantial self-regulatory aspects. This was not the case in *Horn*, wherein the Court held that "the principle of physician-patient confidentiality . . . is not a self-policing rule critical to professional self-regulation" (100 NY2d at 96).

---

**3.** It is noteworthy that in *Wieder*, we were cognizant of the problems inherent in a contractual relationship wherein a person requires another to carry out certain tasks and then proceeds to prevent that person from completing those duties: "when A and B agree that B will do something it is understood that A will not prevent B from doing it. The concept is rooted in notions of common sense and fairness" (*Wieder*, 80 NY2d at 637). We found that "[j]ust such fundamental understanding, though unexpressed, was inherent in the relationship between plaintiff and defendant law firm" (*id.*). That is no less true of the relationship between a compliance officer and a hedge fund.

The majority attempts to distinguish this case from *Wieder*. However, the purportedly material distinctions identified fail to appropriately take into account the principles we expounded upon in *Wieder*. The Court erroneously finds it to be relevant that Sullivan "had four other titles at Peconic" (majority op at 264). That is not a logical basis upon which to justify the different treatment of the plaintiff in *Wieder* as compared to Sullivan. If that were a valid distinction, then an unscrupulous employer wishing to avoid the application of the *Wieder* exception in a case in which it would otherwise apply would shield itself by giving any person potentially subject to the exception additional job titles and/or functions. Nothing in *Wieder* suggests that we intended to create such a loophole. That said, where an employee is merely peripherally responsible for informing his or her employer (or others) of violations of certain obligations, that person is unlikely to be covered by the *Wieder* exception. This is not such a case. Within Sullivan's role as a compliance officer, his sole duty was to ensure compliance with the applicable provisions of law and ethical rules and Peconic was also bound to adhere to the same rules in providing services to its clients. And, of course, in order to succeed, plaintiff would have to prove that he was terminated due to his actions as Chief Compliance Officer, not in some other capacity at Peconic.

Perhaps the majority's emphasis on Sullivan's multiple roles is drawn from the language of our decision in *Horn*, where we implicitly recognized that the plaintiff doctor's primary job function was not the ethical and lawful provision of medical treatment to New York Times employees, but rather that her main role was to "apply[ ] her professional expertise in furtherance of her responsibilities as a part of corporate management" (100 NY2d at 95). However, it cannot similarly be said that Sullivan's primary role as Chief Compliance Officer was anything other than to ensure the ethical and lawful provision of investment adviser services. In *Horn*, we noted that "Horn was employed as the Associate Medical Director of the Times' in-house Medical Department, where whatever medical care and treatment she rendered was provided only to fellow employees and only as directed by her employer" and that she alleged that she was responsible for determining whether "injuries suffered by Times employees were work-related, thus making the employees eligible for Worker's Compensation payments" (*Horn*, 100 NY2d at 95 [internal quotation marks omitted]). We found

that "[w]hen Horn made assessments as to whether a Times employee had suffered a work-related illness or injury, she was surely calling upon her knowledge as a physician, but not just for the benefit of the employee" (*id.*). Here the Chief Compliance Officer position was created in order to protect Peconic's clients from ethical and legal violations. Additionally, Peconic had the same responsibility to its clients as did Sullivan. In *Horn*, the New York Times may have had certain responsibilities to its employees, but it was not a provider of medical services and it was therefore not subject to the same rules and regulations governing the relationship between physicians and patients.

Much is made of the fact that Sullivan was not a member of a firm of compliance officers (*see* majority op at 264), leading to the erroneous conclusion that he was not situated similarly to the plaintiff in *Wieder*, who was an attorney working for a firm of attorneys. The plaintiff in *Wieder* was an employee of a business that represented clients and was bound to follow certain stringent legal and ethical rules. Similarly, Sullivan was an employee of a business that was subject to certain legal and ethical obligations to its clients and his reason for being, as a compliance officer, was to ensure that in providing services to those clients, those rules were followed at all times.

The majority suggests that, going forward, employees in Sullivan's position can look to federal whistleblower protections. But the common law should protect compliance officers from retaliatory termination from the inception of their investigations into suspected wrongdoing, even before they make any reports to the government, without the need for recourse to federal statutes or, for that matter, to state statutes.

The Court's decision concludes that "[n]othing in federal law persuades us that we should change our own law to create a remedy where Congress did not" (majority op at 265). The clear implication of this statement is that in order for hedge fund compliance officers to be entitled to the same protections as attorneys working in law firms, these protections must be conferred by statute. This approach creates a problem for legislators to solve where none existed previously. Prior to today, it was unnecessary for either Congress or this State's Legislature to create a new rule to protect employees like Sullivan. The at-will employment doctrine and the *Wieder* exception, both of which are creatures of common law, provide clear guidance. Rather than alluding to the possible creation of a new statutory remedy, this Court should instead properly apply *Wieder*.

The majority unwisely limits the exception to the at-will employment doctrine that we identified in *Wieder*. In so doing, it creates a great potential for abuse in the financial services industry. I respectfully dissent and would reinstate the second cause of action in the complaint.

Judges GRAFFEO, READ, PIGOTT and JONES concur with Judge SMITH; Chief Judge LIPPMAN dissents in a separate opinion in which Judge CIPARICK concurs.

Order affirmed, etc.