Fuentes v. Griffin

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2015

(Argued: November 17, 2015                                    Decided: July 15, 2016)

Docket No. 14-3878

_____

JOSE ALEX FUENTES,

Petitioner-Appellant,

- v. -

T. GRIFFIN, Superintendent,

Respondent-Appellee.[*]
_____

Before: KEARSE, STRAUB, and WESLEY, Circuit Judges.

Appeal from a judgment of the United States District Court for the Eastern District of New York, Sandra L. Townes, Judge, denying amended petition pursuant to 28 U.S.C. § 2254 for habeas corpus on the grounds that the prosecution suppressed a record of the alleged rape victim's psychiatric consultation, in violation of petitioner's due process rights, see Brady v. Maryland, 373 U.S. 83 (1963), and that petitioner's trial counsel provided ineffective assistance. The district court denied the petition on the ground that the state courts' rejections of Fuentes's constitutional claims

_____

[*]     The Clerk of Court is directed to amend the official caption to conform with the above.

were neither contrary to nor unreasonable applications of clearly established federal law. We conclude that Fuentes's petition should have been granted on the ground that the state court's rejection of his Brady claim was an unreasonable application of the materiality standard established by Kyles v. Whitley, 514 U.S. 419 (1995).

Reversed and remanded.

Judge Wesley dissents in a separate opinion.

COLLEEN P. CASSIDY, New York, New York (Federal Defenders of New York, Inc., Appeals Bureau, New York, New York, on the brief), for Petitioner-Appellant.

AMY APPELBAUM, Assistant District Attorney, Brooklyn, New York (Kenneth P. Thompson, District Attorney of Kings County, Leonard Joblove, Assistant District Attorney, Brooklyn, New York, on the brief), for Respondent-Appellee.

KEARSE, Circuit Judge:

Petitioner Jose Alex Fuentes, a New York State ("State") prisoner convicted of rape in the first degree and sodomy in the first degree, appeals from a judgment of the United States District Court for the Eastern District of New York, Sandra L. Townes, Judge, denying his amended petition pursuant to 28 U.S.C. § 2254 for a writ of habeas corpus on the grounds that the prosecution suppressed a psychiatric record of an evaluation of the complainant, in violation of Fuentes's due process rights, see Brady v. Maryland, 373 U.S. 83 (1963), and that Fuentes's trial counsel rendered ineffective assistance by failing to prepare cross-examination or call expert witnesses to counter expert testimony introduced by the prosecution. The district court denied the petition on the ground that the State courts' rejections of Fuentes's constitutional claims were neither contrary to nor

2

unreasonable applications of clearly established federal law, the standard set by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). On appeal, Fuentes contends principally that the rejection by the New York Court of Appeals of his <u>Brady</u> claim was an unreasonable application of the materiality standard established by <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995), and that the decision of the Kings County Supreme Court--the highest State court to address his ineffective-assistance-of-counsel claim on the merits--was an unreasonable application of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). For the reasons that follow, we conclude, without need to assess the claim of ineffective assistance of counsel, that Fuentes's petition should have been granted with respect to the <u>Brady</u> claim. The contents of the suppressed psychiatric record provided information with which to impeach the complaining witness and to support the defendant's version of the events. The New York Court of Appeals, as the State concedes, misread the psychiatric record. And although the State argues that the error was harmless, the Court's conclusion that suppression of the document had no prejudicial effect resulted from its lack of understanding of what the psychiatric record stated, along with its failure to balance the evidence in light of the record as a whole and its inability to appreciate the import of the document in the unique context of this case, where (a) the issue was not whether an alleged rapist was the defendant but instead whether what occurred was a rape rather than a sexual encounter in which the complainant participated willingly, (b) the complainant provided the only evidence that what occurred was a crime, and (c) the withheld document was the only evidence by which the defense could have impeached the complainant's credibility as to her mental state. We reverse the decision of the district court and instruct that a new judgment be entered, ordering that Fuentes be released unless the State affords him a new trial within 90 days.

# I. BACKGROUND

The present case arises out of the alleged sexual assault by Fuentes on a woman--referred to herein as "G.C."--on the roof of her apartment building in the early morning hours of January 27, 2002. It is undisputed that Fuentes and G.C. had oral and vaginal intercourse on that roof; but the only persons present were G.C. and Fuentes, and the issue for trial was whether the sex was consensual. As set out in greater detail below, G.C., who was 22 years old in January 2002, testified that in the wee hours of January 27 she had gone to an arcade with friends; that a few hours later she left with the same friends to go home; and that when she exited the subway alone near her home, a stranger--later identified as Fuentes--followed her home, threatened her with a knife, and raped and sodomized her. In contrast, Fuentes, 23 years old in January 2002, testified that he and G.C. had met in a bar at the arcade, hit it off, left together, went to G.C.'s building for the mutual purpose of having sex, and had done so; however, when G.C. suggested that they see each other again and Fuentes demurred, she became angry and self-deprecating and said he would be sorry. The principal issue on this appeal is whether Fuentes was denied a fair trial by the prosecution's nondisclosure of the psychiatric record made with respect to G.C. later on January 27.

A. The State's Evidence at Trial

The State's trial evidence included G.C.'s medical records and the testimony of several witnesses. In addition to G.C., the State's witnesses included one of the friends who had been with G.C. at the arcade on January 27, two police officers, and expert witnesses.

4

1. G.C.'s Testimony

G.C. testified that just after midnight on January 27 she, her friend Tammy Little (or "Tammy"), and Tammy's sister, cousin, and mother were in Manhattan at an arcade in Times Square. Some three hours later, G.C. and her friends left to go home to Brooklyn by subway. At the appropriate stop, G.C. left the others and switched to a G train to the Flushing Avenue station, near the Marcy Projects where she lived with her mother and three sisters. While walking home from that subway station, G.C. noticed a man--identified at trial as Fuentes--walking behind her.

When G.C. entered her building, Fuentes followed her inside. Having "a bad feeling," G.C. declined to get into the building's elevator with Fuentes, intending to use it after he had used it. (Trial Transcript ("Tr.") 368-69.) However, when the elevator returned to the ground floor, Fuentes was still inside. He appeared to be exiting, but as G.C. was entering, he pushed her in and followed her; Fuentes put a knife to her neck, and told her, "'don't do nothing stupid or I'll cut you.'" (Id. at 369-70.) They took the elevator to the sixth floor, the top floor and the floor on which G.C.'s apartment was located; they then walked up a flight of stairs to the roof. Once on the roof, Fuentes forced G.C. to engage in oral and vaginal sex. G.C. did not see a condom and did not recall that one was used. (See id. at 375, 426.)

They then took the stairs and elevator down, with Fuentes holding his knife to G.C.'s neck. After they exited the building, Fuentes put the knife away, put his arm around G.C.'s shoulders as if she "was his girlfriend," and "asked [G.C.] to walk with him to the train station." (Id. at 377.) On the way, Fuentes apologized and said "he was going through something." (Id. at 377-78.) Fuentes told G.C. his mother was from Honduras, and G.C. testified that she "must have" told him she too was Honduran. (Id. at 403.) Fuentes told G.C. his name was "Alex." (Id. at 378, 428.)

5

When they arrived at the subway station and went down the stairs, Fuentes took G.C.'s cell phone, powered it down, wiped its surface, and returned it to her. He warned G.C. not to call the police. (See id. at 379.) When Fuentes asked G.C. "'which side goes to Queens?'" she informed him they were on the wrong side; they went back up to the street, and Fuentes crossed to the side on which the G train goes to Queens. (See id.)

G.C. watched Fuentes descend toward the Queens-bound platform; she then walked back to her apartment and went to sleep. (See id. at 380-81.) She did not tell her mother she had been raped. Asked why, G.C. responded, "[b]ecause she wouldn't have believed me." (Id. at 381.)

When G.C. awoke around noon, she got dressed and went to Tammy's home, where she told Tammy and Tammy's sister and mother that she had been raped. After about an hour, G.C. left and went to Woodhull Hospital and reported that she had been raped. A rape kit was prepared, and hospital personnel informed the police. (See id. at 383.) G.C. described her attacker to the police.

2. Testimony of Tammy Little

Tammy Little, G.C.'s good friend since high school, testified that she, her mother, and her sister were at the arcade in Times Square with G.C. in the early morning hours of January 27; Tammy testified that the four of them eventually left Manhattan together via subway. (See Tr. 501-02). Tammy did not see Fuentes that night, nor did she see G.C. talk to any men while they were at the arcade. (See id. at 504-05.)

Tammy testified that G.C. came to her house in the afternoon on January 27 and told Tammy and Tammy's mother that she had been raped "when she was home, she was going into the building." (Id. at 503.) Tammy testified that G.C. did not provide any other details; she "didn't tell [them] she got raped at knifepoint" (id. at 507):

6

Q. And when she told you she got raped, what did she say to you? What did she say?

A. That was it, that she was raped.

(Id.) In response, Tammy and her mother were in shock, did not tell G.C. to call the police, and said nothing. (See id. ("I didn't say anything.").) G.C. departed; Tammy did not know where she went (see id. at 504):

Q. So she came in, told you she was raped and just left?

A. Yes.

(Id. at 508.)

3. Police Witness Testimony

Police officer Kevin Fedynak and his partner interviewed G.C. at Woodhull Hospital on January 27. Fedynak testified that G.C. described her attacker as a well-dressed "male Hispanic, light skin, about six foot two, 200 pounds, going by the name of Alex." (Tr. 456; see id. at 465.)

Police detective Steven Litwin testified that two years later, in January 2004, he was informed that the male DNA collected in G.C.'s rape kit matched that of Fuentes. He arrested Fuentes in June of that year. (See id. at 676-78.)

Litwin had interviewed G.C. in September of 2002--her first police interview since January 27, 2002, another detective having made several unsuccessful attempts to interview her in the interim. (See id. at 675-76, 682-83; see also id. at 405-08 (testimony of G.C.).) Litwin testified--after reviewing the record of his September 2002 interview of G.C.--that in describing the January 27 events to him, G.C. told him that Fuentes was not on her building's elevator when it returned to the ground floor; instead, she got on the empty elevator alone, but the elevator then stopped at the second

7

floor. (See id. at 684-85.) (G.C., in her testimony, denied having given Litwin this version of the event (see id. at 419-20).)

### 4. Medical and Expert Evidence

The record of G.C.'s physical examination at the hospital on January 27 indicated that her appearance was within normal limits, as were her skin, sensory organs, and alertness. (See Tr. 568-71, 573.) The examination did not reveal any bruises, swelling, or lacerations anywhere on her body, or any marks on her neck to indicate any trauma. (See id. at 571-72, 576-77, 586-87 ("no signs of trauma to any" "parts of [G.C.'s] body that were examined").) On "the assumption that she [had been] sexually assaulted," G.C. "was given prophylactic antibiotics for sexually transmitted diseases." (Id. at 565.) The examination had revealed "no external or internal trauma . . . in the pelvic area." (Id. at 564.)

The State called two expert witnesses with respect to the effects of rapes on victims. One, Daniel McSwiggan, was a Woodhull Hospital nurse who was certified in sexual assault forensic examination. McSwiggan, who had not examined G.C., testified that "the absence of visible trauma to [G.C.'s] vaginal area," noted during her January 27 pelvic examination, did not mean that she had not been raped. (Id. at 565-66.)

The other, Dr. Eileen Treacy, was a psychologist who also had not examined G.C. She testified that "a recognizable pattern of behavior that is exhibited by victims of sexual assault," called "rape trauma syndrome" (id. at 646), may include delayed reporting of the event. However, rapes by strangers are "reported with higher frequency" than non-stranger rapes. (Id. at 653, 659.)

B.  Fuentes's Defense

Fuentes testified in his own defense and called one additional witness.  The latter was Aubry Weekes, a private investigator who was a retired New York City detective and who interviewed G.C. for the defense in February 2005.  Weekes testified that G.C. told him she had met Fuentes at the arcade and had left with him; she "[s]aid Mr. Fuentes took her home." (Tr. 711.) (G.C., in her testimony, denied having told Weekes that she met Fuentes at the arcade (see id. at 430-31).) Weekes testified that G.C. did not tell him she had left the arcade with Tammy (see id. at 711); she did not tell him she was raped at knifepoint (see id. at 698); she did not tell him she was raped (see id.).

Fuentes testified that in the early morning hours of January 27, 2002, he and two friends were at the arcade in Times Square, and there he met G.C. in the bar on the second floor.  (See id. at 716-18.)  Fuentes told G.C. his name was "Alex Fuentes" (id. at 759); he testified that he is called "Alex" although his first name is "Jose," because all of the males in his family have the first name Jose and they all go by their middle names (id. at 716).  Fuentes testified that he and G.C. conversed, discussing school, their jobs, their birthdays, their shared connection to Honduras, music, and the Honduran singer "Lisa Left Eye Lopez" [sic].  (Id. at 719-20.)

Around 4 a.m., Fuentes said he was leaving; G.C. said she was leaving too, and Fuentes suggested that they go to a place near where he lived in Queens, or to his apartment.  He and G.C. left the arcade together, taking the R train to Queens, and engaging in kissing, heavy petting, and giggling en route (see id. at 742, 744).  However, when Fuentes mentioned that they would need to be quiet in his apartment because a relative was living with him, G.C. told him that "she had a better spot [for them] to go to."  (Id. at 723.)  Fuentes and G.C. changed trains at Queens Plaza and took the G train to the Flushing Avenue stop.  G.C. led Fuentes from the subway station to her apartment

building, where she took him to the roof. Once on the roof, Fuentes and G.C. engaged in oral and vaginal intercourse. Fuentes stated that he put on a condom prior to the vaginal intercourse, but that it broke during the act; in the heat of the moment, with G.C.'s encouragement, he continued without one.

When they were done, Fuentes asked G.C. how to get back to the subway, and she offered to walk with him. (See id. at 754-55.) On the way, G.C. suggested that the two of them "go to South Street Seaport and basically hang out again." (Id. at 755.) Fuentes, however, preoccupied with thoughts of the need to get an STD test because he had had unprotected sex with someone he had just met, did not immediately respond. G.C. asked Fuentes if he was listening to her and pointed out that he had not yet asked for her phone number. When Fuentes suggested that they just "'leave things the way they are,'" G.C. asked if Fuentes thought she was "'a ho.'" (Id. at 757.) Fuentes assured G.C. that he was not judging her, but reiterated that it was a "'one-night stand'" and that he would like to "'leave it at that.'" (Id.) Now upset, G.C. told Fuentes that he must think she was "'a ho'" and that he was "'going to be sorry.'" (Id. at 757-58.) Fuentes testified that G.C. was so vehement that a subway employee in the booth looked up at them. Because G.C. "was acting erratic" and seemed "unstable," Fuentes told G.C. that he was leaving and did not want her phone number. (Id. at 758.) When he walked away, G.C. cursed at him.

C. The Undisclosed Psychiatric Record

While in the middle of his closing argument, Fuentes's attorney was leafing through the trial exhibits, including the medical records the State had introduced. He discovered among G.C.'s medical records a page--titled "Record of Consultation"--that the prosecution had not produced to the defense. The Record of Consultation (or "ROC") disclosed that when G.C. was at Woodhull Hospital

10

on January 27 having reported she had been raped, she had a psychiatric consultation. In pertinent part, the Record of Consultation reads as follows:

> [G.C.] is a 22 y-o Black female, single, living w/ mothe[r], working in McDonalds x 2m, reporting depression x 2y and ideas of killing herself since then, because she has "family problems" feeling mistreated by mother, frequent crying spells, withdrawn, lack of energy - Now, she feels angry at herself "because she went home late and put herself a[t] risk" - Fair sleep - She has no SI currently and her depression is "as usual"
>
> -PPH: (-) - Substance Abuse Hx: Marijuana use x 2, last y
> -PMH: Asthma - LMP: 1/02
> -MSE: A + 0 x3, mood depressed, denies S/H ideations or A/V hallucinations, no delusions elicited.
> IMP: I Dysthymic Disorder: Pt wants someone to talk to about her problems. - Cannabis Abuse.
> Suggest: Refer to Psych Clinic upon D/C.

(Court Exhibit A-1 (emphases added).)

Upon discovering the previously undisclosed Record of Consultation, Fuentes's attorney requested a sidebar, and he later moved for a mistrial on the ground that the nondisclosure of the ROC constituted a Brady due process violation. Fuentes's attorney had been assured by the prosecutor that all of G.C.'s medical records had been turned over (see, e.g., Tr. 843-44), and yet the defense had not been given the Record of Consultation (see, e.g., id. at 844-45). He argued that the cross-examination he could have conducted if he had known of the ROC "would have had a major effect on th[e] jury's opinion of [G.C.'s] credibility in this case." (Id. at 847.) Further, G.C.'s mental health history as shown in the ROC would have substantiated Fuentes's account of G.C.'s erratic behavior at the subway station, and thus supported Fuentes's version of the events. (See, e.g., id. at 863-64.) Counsel also pointed out that during her trial testimony, G.C. "broke down on the stand and cried many times. And the jury could have very easily been led to believe the reason she was crying was the result of this incident. Now, after looking at this psych. record, we find she was crying well before the events of that evening . . . ." (Id. at 851.)

11

The prosecutor admitted to the judge that she had intentionally withheld the Record of Consultation from discovery but stated that she did so out of concern for psychiatrist-patient privilege. The court admonished the prosecutor for failing to at least disclose the document to the court to obtain a ruling on discoverability; it reserved judgment on Fuentes's mistrial motion until after return of the verdict.

The jury, on its second day of deliberations, found Fuentes guilty of first-degree rape and first-degree sodomy. The court did not grant a mistrial, having concluded (see id. at 866-67) that the Record of Consultation was not Brady evidence because the document did not contain anything exculpatory. After denying a posttrial motion to set aside the verdict because of the asserted Brady violation, inter alia, the court sentenced Fuentes principally to 25 years' imprisonment.

D. The State-Court Appeals

Fuentes appealed his conviction, renewing his contention, inter alia, that the State's deliberate suppression of the Record of Consultation constituted a Brady violation that denied him a fair trial. The Appellate Division affirmed, stating that "[w]hile the People unquestionably have a duty to disclose exculpatory material in their control, a defendant's constitutional right to a fair trial is not violated when, as here, he is given a meaningful opportunity to use the allegedly exculpatory material to cross-examine the People's witnesses or as evidence during his case . . . ." People v. Fuentes, 48 A.D.3d 479, 479, 851 N.Y.S.2d 628, 628 (2d Dep't 2008), aff'd on other grounds, 12 N.Y.3d 259, 879 N.Y.S.2d 373 (2009).

The New York Court of Appeals, in a 5-2 decision, affirmed, concluding that "the undisclosed document is not material," and that therefore, "the People's nondisclosure, while ill-advised, does not constitute a Brady violation." People v. Fuentes, 12 N.Y.3d at 260, 879 N.Y.S.2d

12

at 374. The Court of Appeals majority (or "Majority") recognized that although all of G.C.'s medical records had supposedly been disclosed to the defense pursuant to the State's open-file discovery agreement, and they were all introduced in evidence by the State during its direct case, the Record of Consultation, made by a hospital psychiatrist who interviewed G.C. on January 27, had been withheld from discovery. See id. at 261-62, 879 N.Y.S.2d at 375. Thus, "[u]naware of its existence, defense counsel did not cross-examine any of the People's witnesses regarding the information contained in the consultation note." Id. at 262, 879 N.Y.S.2d at 375. The Majority stated that

> [t]he Due Process Clauses of the Federal and State Constitutions both guarantee a criminal defendant the right to discover favorable evidence in the People's possession material to guilt or punishment (see Brady, 373 US at 87-88; People v Bryce, 88 NY2d 124, 128 [1996]). Impeachment evidence falls within the ambit of a prosecutor's Brady obligation (see Giglio v United States, 405 US 150, 154-155 [1972]). To establish a Brady violation, a defendant must show that (1) the evidence is favorable to the defendant because it is either exculpatory or impeaching in nature; (2) the evidence was suppressed by the prosecution; and (3) prejudice arose because the suppressed evidence was material (see Strickler v Greene, 527 US 263, 281-282 [1999]).

People v. Fuentes, 12 N.Y.3d at 263, 879 N.Y.S.2d at 376 (emphases added).

The Court noted that, under New York law, if the accused has "ma[de] a specific request for a document" that is withheld, the appropriate standard to measure materiality is whether there is "a reasonable possibility" that the failure to disclose the exculpatory evidence contributed to the verdict. Id., 879 N.Y.S.2d at 376 (internal quotation marks omitted). The Majority assumed the applicability to Fuentes of the "reasonable possibility" standard--a burden lower than the federal standard of "reasonable probability," see People v. Vilardi, 76 N.Y.2d 67, 72, 75-77, 556 N.Y.S.2d 518, 520, 522-23 (1990) (internal quotation marks omitted) (emphases in Vilardi)--but concluded that Fuentes had not shown materiality, as it found that the document would have been more valuable to the prosecution than the defense:

13

[D]isclosure of this one-page document would not have altered the outcome of the case. Significantly, the document notes that the victim was upset because she placed herself in danger when she walked home from the train by herself in the early morning hours preceding her attack. That information would have undoubtedly strengthened the People's case by corroborating the victim's testimony that she walked home alone when defendant accosted her at knifepoint.

People v. Fuentes, 12 N.Y.3d at 263-64, 879 N.Y.S.2d at 376-77 (footnote omitted) (emphases added). In concluding that the document's value to the defense, in contrast, would have been "at best, minimal," the Court stated that

[a]lthough the document notes that the victim had experienced suicidal thoughts, it is unclear whether these thoughts were the result of having been raped only hours earlier, or due to more general feelings of depression, stemming from a strained relationship with her mother. Further, the record of consultation does not note that the victim was suffering from any serious psychiatric conditions creating hallucinations or delusions; in fact it indicates that the victim had no previous psychiatric history. . . .

Defendant argues that the statement in the document noting the victim's "cannabis abuse" would have changed the outcome of the case. The report explains that the victim only used marijuana twice during the past year, and nowhere does it state that she took any other substances that could have seriously impacted or impaired her perceptions of reality. Therefore, in the context of this case, the value of the undisclosed information as admissible impeachment evidence would have been, at best, minimal.

Id. at 264, 879 N.Y.S.2d at 377 (emphases added). The Court stated further that

defendant's version of events was contradicted in several key respects. The friend's testimony refuted defendant's version because she testified that the victim left Manhattan and boarded a train with her and her family without defendant ever being present. Further, the victim testified in specific detail regarding how defendant took steps to avoid apprehension, including turning her cell phone off and wiping it clean of fingerprints. It is also contrary to common sense to believe that the victim would have invented a rape and subjected herself to an invasive hospital examination in the hope of getting revenge for defendant's supposed refusal of her advances. She did not have a way of leading the police to defendant, or any reason to be confident he would ever be caught; he was not identified until the DNA match was found years later.

Id. at 264-65, 879 N.Y.S.2d at 377 (emphases added).

14

The Majority concluded that disclosure of the Record of Consultation "would not have changed the outcome of the trial," and hence did not meet the Brady materiality standard because of what the Majority viewed as the "strength of the People's case," "the implausibility of defendant's version of [the] events," and the "document's extremely limited utility as impeachment evidence." Id. at 265, 879 N.Y.S.2d at 377.

E.  The Federal Habeas Proceedings

In 2011, Fuentes, proceeding pro se, timely commenced the present habeas case, raising multiple constitutional claims.  In 2012, following exhaustion of his claims in state court, the district court appointed counsel to represent him, and the amended habeas petition was filed, asserting only the Brady claim and a Sixth Amendment claim of ineffective assistance of counsel.  Both claims were rejected by the district court.

The magistrate judge to whom the district court referred Fuentes's petition for report and recommendation recommended that the petition be granted on the ground that the New York Court of Appeals unreasonably applied the materiality standard for Brady claims set by the Supreme Court in Kyles v. Whitley, 514 U.S. 419.  The magistrate judge concluded principally that the New York Court of Appeals majority erred (a) in not realizing that the Record of Consultation stated that G.C. had been in a state of depression for two years, (b) in apparently not recognizing that the prosecution's failure to produce this document deprived Fuentes of the opportunity to investigate and cross-examine G.C. with regard to her mental health history, and (c) in unreasonably discounting the importance of this impeachment material, given that G.C.'s testimony was the only inculpating evidence.

15

The district court, in a Memorandum and Order dated September 30, 2014 ("D.Ct. Ord."), denied habeas, rejecting the recommendation to grant the writ on the basis of the Brady claim. Although agreeing with the magistrate judge that the New York Court of Appeals misread the Record of Consultation with respect to the duration of G.C.'s depression, the district court concluded that "it was not clearly established by federal law that the information contained in the ROC was material for Brady purposes," D.Ct. Ord. at 10-11, because "[t]he Supreme Court has not addressed whether mental health information such as the type contained in the ROC is considered 'material' for Brady purposes," id. at 12. The district court also stated that the Record of Consultation in no way suggested that G.C. was unable to accurately and truthfully perceive and recall events. Id.

## II. DISCUSSION

Fuentes moved in this Court for a certificate of appealability, arguing that the New York Court of Appeals' rejection of his Brady claim was an unreasonable application of federal law, and that the State Supreme Court's rejection of his ineffective-assistance-of-counsel claim was an unreasonable application of Strickland v. Washington, 466 U.S. 668. This Court granted the motion. As we now conclude that the writ should have been granted on the basis of the Brady claim, awarding Fuentes release or a new trial, we do not further address his claim of ineffective assistance of counsel.

### A. AEDPA Principles

To the extent pertinent here, AEDPA provides that "with respect to any claim that was adjudicated on the merits in State court proceedings," a federal court may not grant a state prisoner's petition for habeas corpus relief unless the state court's adjudication of the claim

16

resulted in a decision that <u>was contrary to</u>, or <u>involved an unreasonable application of</u>, clearly established Federal law, as determined by the Supreme Court of the United States,

28 U.S.C. § 2254(d)(1) (emphases added). "'[C]learly established Federal law' under § 2254(d)(1)" refers to "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003) ("Andrade").

A state-court decision is "contrary to" clearly established federal law "'if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Id. at 73 (quoting Williams [Terry] v. Taylor, 529 U.S. 362, 405-06 (2000) ("Williams [Terry]")). A state-court decision is an "unreasonable application of" clearly established federal law "'if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" Andrade, 538 U.S. at 75 (quoting Williams [Terry], 529 U.S. at 413).

In order to hold that a state court's adjudication constituted "an unreasonable application of" a Supreme Court holding, a federal court must find more than just "that the relevant state-court decision applied clearly established federal law erroneously or incorrectly," Williams [Terry], 529 U.S. at 411, for "the purpose of AEDPA is to ensure that federal habeas relief functions . . . not as a means of error correction," but rather "as a 'guard against extreme malfunctions in the state criminal justice systems,'" Greene v. Fisher, 132 S. Ct. 38, 43 (2011) (quoting Harrington v. Richter, 562 U.S. 86, 102 (2011) ("Richter") (other internal quotation marks omitted). Thus, "[r]elief is available under § 2254(d)(1) only if the state court's decision is objectively unreasonable." Yarborough v. Alvarado, 541 U.S. 652, 665 (2004) ("Alvarado"); see, e.g., Williams [Terry], 529 U.S. at 410-13; Andrade, 538 U.S. at 75.

17

Ultimately, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. In applying this principle, we bear in mind that

> the range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

Alvarado, 541 U.S. at 664. But "[c]ertain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt." Id. at 666.

B. Due Process and the Prosecutorial Duty of Disclosure

The due process principles applicable here are well and clearly established. "The prosecution[ has an] affirmative duty to disclose evidence favorable to a defendant . . . ." Kyles, 514 U.S. at 432. That duty

> can trace its origins to early 20th-century strictures against misrepresentation and is of course most prominently associated with th[e Supreme] Court's decision in Brady v. Maryland, 373 U.S. 83 (1963). See id., at 86 (relying on Mooney v. Holohan, 294 U.S. 103, 112 (1935), and Pyle v. Kansas, 317 U.S. 213, 215-216 (1942)).

Kyles, 514 U.S. at 432. The contours of the duty have progressively been refined. In Brady, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon

18

request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In United States v. Agurs, 427 U.S. 97, 107 (1976), the Court held that the duty to disclose such evidence is applicable irrespective of whether the accused made a request. In United States v. Bagley, 473 U.S. 667, 676 (1985), the Court held that the duty to disclose exists irrespective of whether the information bears on the defendant's innocence or a witness's impeachment. And if the withheld evidence contains material for impeachment, it falls within the Brady principles even if it may also be inculpatory: "Our cases make clear that Brady's disclosure requirements extend to materials that, whatever their other characteristics, may be used to impeach a witness." Strickler v. Greene, 527 U.S. 263, 282 n.21 (1999); see, e.g., Bagley, 473 U.S. at 676.

However, the withholding of such evidence does not violate the accused's due process right unless the evidence is "material," in the sense that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. at 682. In Banks v. Dretke, 540 U.S. 668 (2004), the Supreme Court stated,

> [o]ur touchstone on materiality is Kyles v. Whitley, 514 U.S. 419 (1995). Kyles instructed that the materiality standard for Brady claims is met when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." 514 U.S., at 435.

Banks, 540 U.S. at 698 (emphases ours). Thus, the Brady materiality

> question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." Bagley, 473 U.S., at 678.

Kyles, 514 U.S. at 434 (emphases ours). The "defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left

19

to convict." Id. at 434-435. He need only show, considering the record as a whole, a "reasonable probability"--and "the adjective is important," id. at 434 (internal quotation marks omitted) (emphasis ours)--of a different result great enough to "undermine[] confidence" that the jury would have found him guilty beyond a reasonable doubt, id. (internal quotation marks omitted).

In Strickler, in which the petitioner had been convicted of capital murder, one issue at trial was the identity of the robbers/murderers, and evidence for impeachment of an eyewitness to the robbery had been suppressed. The Supreme Court noted that there was "considerable forensic and other physical evidence linking petitioner to the crime," including: the petitioner's fingerprints on the inside and outside of the victim's car; "shoe impressions," near where the victim's body was found, "match[ing] the soles of shoes belonging to petitioner"; a bag at petitioner's mother's house containing identification cards belonging to the victim; and hairs near the victim's body that "were microscopically alike in all identifiable characteristics to petitioner's hair." Strickler, 527 U.S. at 293 & n.41, 268-69 (internal quotation marks omitted). The Strickler Court approved the rejection of the petitioner's Brady claim because it was "not convinced . . . that there [wa]s a reasonable probability that the jury would have returned a different verdict" if the testimony of the eyewitness in question "had been either severely impeached or excluded entirely." Id. at 296. In sum, "in Strickler, considerable forensic and other physical evidence link[ed] [the defendant] to the crime and supported the capital murder conviction," Banks, 540 U.S. at 701 (internal quotation marks omitted), and "[t]he witness whose impeachment was at issue in Strickler gave testimony that was in the main cumulative," id. at 700. "In contrast" in Banks, the Court's confidence in the verdict was undermined where the testimony of the witness who could have been impeached by the withheld evidence was "the centerpiece" of the relevant phase of the prosecution's case. Id. at 701.

With these principles in mind, and reviewing the decision of the district court de novo, see, e.g., Contreras v. Artus, 778 F.3d 97, 106 (2d Cir. 2015), we conclude (1) that the district court erred in ruling that federal law as set forth by the Supreme Court did not sufficiently clearly establish that records as to a witness's mental health may be Brady material, and (2) that the decision of the New York Court of Appeals was an unreasonable application of the above Brady standards.

C.    The Applicability of Brady to Available Psychiatric Records as Clearly Established by the Supreme Court of the United States

The district court ruled that AEDPA precludes habeas relief to Fuentes on his Brady claim on the ground that the United States Supreme Court has not sufficiently clearly addressed whether records as to a witness's mental health, such as the Record of Consultation here showing G.C.'s depression and Dysthymic Disorder, may properly be considered Brady material. We disagree. Based on clearly established fundamental rights and principles, we think it indisputable that if the prosecution has a witness's psychiatric records that are favorable to the accused because they provide material for impeachment, those records fall within Brady principles, and that the Supreme Court has so recognized.

The Confrontation Clause of the Sixth Amendment, made applicable to the states by the Fourteenth Amendment, see Pointer v. Texas, 380 U.S. 400, 403-06 (1965), guarantees the defendant in a criminal prosecution the right to confront the witnesses against him. This "means more than being allowed to confront the witness physically," for "[t]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination," Davis v. Alaska, 415 U.S. 308, 315-16 (1974) (internal quotation marks and emphasis omitted), and "the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness," id. at 316.

21

In particular, a witness's "credibility" may be attacked "by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." Id. (emphases added); see, e.g., United States v. Abel, 469 U.S. 45, 52 (1984) ("[b]ias is a term used . . . to describe the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party" (emphasis added)). Cross-examination is especially "important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy." Greene v. McElroy, 360 U.S. 474, 496 (1959) (emphases added). "A successful showing of bias on the part of a witness would have a tendency to make the facts to which he testified less probable in the eyes of the jury than it would be without such testimony." Abel, 469 U.S. at 51.

These principles are sufficiently fundamental that their applicability to available psychiatric evidence raising questions about the witness's biases and the reliability of his or her testimony is beyond doubt. In Williams [Michael] v. Taylor, 529 U.S. 420 (2000) ("Williams [Michael]"), one of the Supreme Court's earliest opinions exploring AEDPA, the Court dealt with a habeas claim that "the prosecution had violated Brady v. Maryland, 373 U.S. 83 (1963), in failing to disclose a report of a . . . psychiatric examination" of Jeffrey Alan Cruse, the petitioner's collaborator in robbery and murder who was the main witness against the petitioner at trial. Williams [Michael], 529 U.S. at 427. The report described Cruse as having feelings of worthlessness and constant suicidal thoughts, see id. at 439; and at Cruse's sentencing, his attorney cited the report's statement that Cruse was suffering from, inter alia, severe depression, see id. at 438. There was no question that the prosecution's failure to disclose the psychiatric report could be a proper basis for a habeas petition under Brady: The Supreme Court noted that when Cruse was sentenced, there were "repeated

22

references to a 'psychiatric' or 'mental health' report in [the sentencing] transcript . . . . with details that should have alerted counsel to a possible Brady claim." Id. (emphases added).

Rather, the question facing the Supreme Court was whether, under AEDPA, the petitioner could be given a federal-court evidentiary hearing on the claim, see 28 U.S.C. § 2254(e)(2) (limiting the right to such a hearing "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings"). The Supreme Court noted that although "[t]he transcript put petitioner's state habeas counsel on notice of the report's existence and possible materiality," Williams [Michael], 529 U.S. at 439--indeed, "state habeas counsel" had "attached [a copy of the transcript] to the state habeas petition he filed," id. at 438--"[p]etitioner did not develop, or raise, . . . the prosecution's alleged Brady violation regarding Cruse's psychiatric report until he filed his federal habeas petition," id. at 429. The Court thus concluded that Williams was not entitled to an evidentiary hearing because he had "not exercise[d] the diligence required to preserve the claim that nondisclosure of Cruse's psychiatric report was in contravention of Brady." Williams [Michael], 529 U.S. at 437-38.

We think it beyond doubt that the Supreme Court recognizes the application of Brady principles to a witness's psychiatric records, possessed by the prosecution, that may be used to impeach his credibility, particularly where, as here, the witness's testimony is the only evidence that there was in fact a crime and the State's other evidence is not strong enough to sustain confidence in the verdict.

D. The Decision of the New York Court of Appeals

Although the New York Court of Appeals recognized that Brady principles are applicable to impeachment evidence in available psychiatric records, we conclude that its ultimate determination in this case--that the suppression of the Record of Consultation was not prejudicial--constituted an unreasonable application of Supreme Court principles for several reasons.

23

First, a materiality analysis requires a careful, balanced examination of the nature and strength of the evidence presented, as well as an evaluation of the potential impact of the evidence on the witness's credibility. Entirely missing from the Majority's reasoning is any analysis of how the ROC might have benefited the defense. That failure was due in large part to the fact that the Court of Appeals' assessment of the Record of Consultation itself was fundamentally flawed because the Majority misread the document. The Majority found that the psychiatric record had "extremely limited utility as impeachment evidence," People v. Fuentes, 12 N.Y.3d at 265, 879 N.Y.S.2d at 377, believing that it was "unclear" that G.C.'s suicidal thoughts mentioned in that document were not simply "the result of having been raped only hours earlier," id. at 264, 879 N.Y.S.2d at 377. However, the Record of Consultation stated precisely that G.C. "report[ed] depression x 2y and ideas of killing herself since then" (Court Exhibit A-1 (emphases added)), and the State concedes that "x 2y" means extending for "two years" (State's brief on appeal at 48 ("Fuentes is correct that New York Court of Appeals mistakenly concluded that the record of consultation was unclear as to whether the complainant's suicidal thoughts were present before the incident . . . . [T]he record of consultation shows that her suicidal thoughts were present as early as two years before the incident.")).

Thus, the suppressed psychiatric record stated unambiguously that on January 27, 2002, G.C. told the hospital psychiatrist that she had been depressed and suicidal for two years. This information was consistent with the Record of Consultation's notation of "Dysthymic Disorder" (Court Exhibit A-1), a condition whose "essential feature," according to the American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders (Fourth Edition) ("DSM-IV")-- which is "an objective authority on the subject of mental disorders," Fuller v. J.P. Morgan Chase & Co., 423 F.3d 104, 107 (2d Cir. 2005)--is a "chronically depressed mood that occurs for most of the day more days than not for at least 2 years," DSM-IV at 345, with symptoms that may include "low

self-esteem," id. at 345, 347. Among "the most commonly encountered symptoms in Dysthymic Disorder may be feelings of inadequacy" and "excessive anger," id. at 346; and the "chronic mood symptoms may contribute to interpersonal problems or be associated with distorted self-perception," id. at 347.

Thus, while the Court of Appeals majority, not recognizing the actual content of the psychiatric record, viewed its impeachment value as "at best, minimal," the information as to G.C.'s chronic depression and Dysthymic Disorder would have, inter alia, provided a way to cross-examine G.C. as to her mental state, and potentially corroborated Fuentes's account of her behavior as "unstable" and "erratic" when he declined to see her again, to wit, being angry and volubly upset at being rejected. (Tr. 757-58.) And, importantly, timely disclosure of the ROC would have provided defense counsel with an opportunity to seek an expert opinion with regard to the ROC's indication of other significant symptoms, in order to establish reasonable doubt in the minds of the jurors because of G.C.'s predisposition toward emotional instability and retaliation--an opinion he was able to obtain after he eventually learned of the psychiatric record but not in time to present it to the jury.

In short, given the Majority's inaccurate reading of the ROC, its application of the Brady principles to the instant case was objectively unreasonable because of its inability to make a reasonable assessment of the benefits to the defense of exploring G.C.'s mental state as revealed in the ROC.

Second, the Majority also found that suppression of the Record of Consultation did not result in prejudice in part because of "the strength of the People's case," stating that Fuentes's version of the events was "implausib[le]," People v. Fuentes, 12 N.Y.3d at 265, 879 N.Y.S.2d at 377, and "was contradicted in several key respects," id. at 264, 879 N.Y.S.2d at 377. This did not reflect a careful, balanced, or fair examination of the nature and strength of the evidence presented, for it both

25

overstated the strength of the State's case and disregarded evidence that supported the plausibility of Fuentes's version.

Contrary to the Majority's depiction, the State's other evidence was not overwhelming. In only one respect was Fuentes's version contradicted by evidence other than the testimony of G.C. herself. As there was no disagreement that intercourse in fact occurred, the presence of semen in G.C.'s vagina did not contradict Fuentes's version. As the State's DNA expert testified, "there isn't" a test for whether a sexual encounter was "consensual" (Tr. 618-19); "[a]ll I can tell you is his semen is present" (id. at 619).

Nor did the other medical evidence contradict Fuentes's version, for there was no affirmative scientific evidence that force had been used against G.C. The hospital examination revealed no trauma or abnormality, external or internal, in G.C.'s pelvic area--or indeed anywhere on her body. Instead, the State's expert medical evidence consisted of testimony that the "absence" of trauma (and the lack of a prompt rape report) did not mean that there had not been rape.

Tammy Little's testimony that G.C. left Manhattan with Tammy and family was the only evidence, other than G.C.'s own testimony, that contradicted Fuentes's version of the events. As the Court of Appeals dissenters noted, credibility was central; and indeed, the jury, during its deliberations, requested rereading of the testimonies of various witnesses, including Tammy (see Tr. 859, 872). If the jury had also had before it the information from G.C.'s psychiatric record that was consistent with Fuentes's testimony, it could well have questioned the credibility of Tammy, especially in light of her description of G.C. as coming to Tammy's home and announcing--without detail--that she had been raped (see id. at 507 (Tammy's testimony that G.C. said "that she was raped"; "[t]hat was it"); id. at 508 ("she came in, told [us] she was raped and just left"))--and of the response of Tammy and her mother, doing nothing and saying nothing (id. at 507).

26

The only other evidence that the Court of Appeals could cite as contradicting Fuentes's version of the events was the testimony of G.C. herself. The Majority cited Strickler in mentioning the materiality element of a Brady claim; but this case was nothing like Strickler, where there was ample forensic evidence on the key issue (see, e.g., Part II.B. above) and the testimony of the witness in question was cumulative. Here, there was no forensic evidence of rape; G.C.'s testimony was the sine qua non of the State's case. Without her testimony, there could be no prosecution at all. The Majority could not properly conclude that the suppression of evidence impeaching G.C. would be of little value because of G.C.'s own testimony.

This is particularly so in light of several significant red flags in G.C.'s testimony, which were nowhere adverted to in the Majority's opinion. For example, the Majority did not mention that G.C. admitted on cross-examination that she had shared some of her personal details with Fuentes, including her Honduran descent and probably her birthday (see Tr. 402-03). That testimony could be viewed in a different light had the jury been aware of the ROC. In addition, there were aspects of G.C.'s trial testimony describing the event that were contrary to what other witnesses testified G.C. had told them. For example, she testified at trial that Fuentes pushed her into the elevator on the ground floor (id. at 369-70); but Detective Litwin testified that G.C., when interviewed, told him that when the elevator returned to the ground floor it was empty, that she got in, but then it stopped on the second floor (see id. at 684-85; but see id. at 419-20 (G.C. denying that she had given Litwin that version)). Further, G.C. testified that Fuentes had taken her cell phone, powered it down, and used his sleeve to wipe it clean of his fingerprints after they went into the subway station (see Tr. 379); but Officer Fedynak testified that when he and his partner interviewed G.C. on January 27, she had not described that action as taking place in the subway; instead, G.C. told them Fuentes took her phone and wiped it off in the elevator on the way down after she and Fuentes had left the roof (see id.

27

at 465)--action that would seem to have been impossible if, as G.C. testified at trial (see id. at 376-77), he was holding a knife to her neck during that entire time. In addition, Weekes, a retired police detective, testified that G.C. told him (though at trial she denied so telling him (see id. at 430-31)) that she had met Fuentes at the arcade, and that Fuentes "took her home" (id. at 711). Nor is it clear how Fuentes would have known to take G.C. to the roof of her building, had he just been a stranger following her home.

Lastly, in assessing Fuentes's version of the events as implausible, the Majority made no mention whatever of the fact that Fuentes told G.C. his name. G.C. testified that he told her his name was "Alex" (Tr. 378, 428); she so informed the police officers who interviewed her at the hospital (see id. at 456 (testimony of Officer Fedynak)); and Fuentes testified he had told her his name (see id. at 759). It was thus beyond dispute that Fuentes told G.C. his name; what was in dispute was where and when that occurred. And, as an objective matter, it seems more plausible that he would have told her his name when meeting and talking with her in a bar than after stalking her from the subway and raping her.

The Majority thus significantly overstated the strength of the State's case, and it concluded unreasonably that Fuentes's version of the events was "contrary to common sense," People v. Fuentes, 12 N.Y.3d at 265, 879 N.Y.S.2d at 377. At trial, the jury deliberated for two days considering which version to accept, asking for, inter alia, read-backs of the testimonies of G.C., Fuentes, and Tammy. As the Court of Appeals dissenters noted, "the issue of credibility was central to the jury's consideration of the case," id. at 266, 879 N.Y.S. 2d at 378. See United States v. Gil, 297 F.3d 93, 104 (2d Cir. 2002) (noting, where the key "question hinged on credibility," that the jury's "struggl[e]" with that question--evinced by its request for read-backs of testimony--was relevant to the determination of materiality). Accordingly, far from evaluating the "trial testimony as a whole,"

28

People v. Fuentes, 12 N.Y.3d at 264 n.*, 879 N.Y.S. 2d at 376 n.*, the Majority ignored substantial aspects of the testimony, thereby overstating the strength of the State's case, and in so doing failed to make a reasonable assessment of how the ROC could benefit the defense.

Third, the Majority's assessment of the Record of Consultation as having "at best, minimal" value was based in part on its view that the ROC would have "strengthened" the State's case by corroborating G.C.'s testimony that she had walked home from the subway alone. Id. at 264, 879 N.Y.S.2d at 376-77. But reliance on potentially inculpatory aspects of the suppressed document is not a proper application of Brady principles. See, e.g., Strickler, 527 U.S. at 282 n.21 (rejecting the prosecution's contention that documents were not Brady material because they were "inculpatory," stating that "[o]ur cases make clear that Brady's disclosure requirements extend to materials that, whatever their other characteristics, may be used to impeach a witness" (internal quotation marks omitted)).

Finally, the Majority failed to consider the unique importance of this evidence. We do not suggest that a prior history of depression or even suicidality by itself necessarily constitutes material impeachment evidence. But the Majority focused on the absence of any indication that G.C. suffered from hallucinations or delusions, see People v. Fuentes, 12 N.Y.3d at 264, 879 N.Y.S.2d at 377; the lack of notation as to a cognitive disorder, however, was not significant in the circumstances here, where the key issue at trial was not whether G.C. was impaired as to her perceptions. The question was not G.C.'s ability to identify Fuentes as the man in question but rather her motivation for accusing Fuentes of engaging in conduct to which she had not consented; and the Record of Consultation was pertinent to the issue of her motivation because it identified a relevant mood disorder.

At bottom, the trial record presented two diametrically opposing versions of what happened, and the jury had to decide whether G.C.'s version of the events, despite Fuentes's version, should be believed beyond a reasonable doubt. G.C.'s testimony was the only evidence that what occurred on the rooftop was a rape rather than a sexual encounter in which she was a willing participant; Fuentes's version was that the encounter was consensual and that G.C. thereafter became angry and vindictive when it became clear that he did not want to see her again. If the jury had been aware of the psychiatric record revealing that G.C. suffered from a chronic disorder characterized by low self-esteem, feelings of inadequacy, and excessive anger--and if counsel had been able to develop this line of defense further by obtaining in time for trial a psychiatric opinion that was obtainable only after the belated discovery of the withheld Record of Consultation--the jury could well have given greater credence to Fuentes's version of the events.

In sum, the suppressed psychiatric record provided the only evidence with which the defense could have impeached G.C. as to her mental state and explained why she might have fabricated a claim of rape. The Majority's failure to consider the context of this impeachment evidence renders its Brady-materiality analysis objectively unreasonable.

Accordingly, we conclude that the Court of Appeals majority's determination that G.C.'s psychiatric record had no more than minimal value was based principally on (a) its failure to understand what that Record of Consultation stated, (b) its failure to recognize weaknesses in the State's case, (c) its impermissible reliance on the fact that the ROC also contained information that could be considered consistent with G.C.'s accusation, (d) its reliance on the content of the testimony of G.C. herself, the witness to be impeached, and (e) its failure to consider the uniquely important nature of the ROC in these circumstances, where G.C. provided the only evidence that Fuentes's conduct was a crime and where the ROC was the only evidence by which the defense could have

30

impeached G.C.'s credibility as to her mental state. In light of these failures and in light of evidence in the record as a whole that was not mentioned by the Majority and that was consistent with Fuentes's version of the events, we conclude that the Court of Appeals' decision that the State's suppression of G.C.'s psychiatric record was not prejudicial was an objectively unreasonable application of Supreme Court law. The State's suppression of the psychiatric record, which would have revealed a disorder that both provided a basis for questioning G.C.'s credibility and provided further support for Fuentes's version of the events, undermines confidence in the outcome of Fuentes's trial.

## CONCLUSION

We have considered all of the State's arguments in support of the New York Court of Appeals' decision and have found them to be without merit. The judgment of the district court is reversed, and the matter is remanded for entry of a new judgment ordering that Fuentes be released unless the State affords him a new trial within 90 days.

31

WESLEY, *Circuit Judge*, dissenting:

Today, the majority holds that a young woman's struggle with a minor depressive disorder is so obviously damaging to her credibility in the prosecution of her alleged rapist that there is no room for fairminded disagreement. The majority reaches this conclusion by speculating about the victim's emotional state based on symptoms nowhere present in the record; instead, the majority extrapolates them from a medical text's general description of symptoms that may be—but are not always—present in people who suffer from the same disorder. The majority's opinion misapplies Supreme Court precedent and creates facts for its AEDPA analysis where none exist in the record. I therefore dissent.

"The writ of habeas corpus is the fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action." *Harris v. Nelson*, 394 U.S. 286, 290–91 (1969). Yet it also "intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). Accordingly, in an effort to protect both individual liberty and federalism, a federal court may grant a writ of habeas corpus in disagreement with a state court's decision only if that decision "was

1

contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States" or "was

based on an unreasonable determination of the facts."  28 U.S.C. § 2254(d).  In

order to hold that a state court's decision was an "unreasonable application" of

federal law, a federal court must conclude "that there was no reasonable basis for

the state court to deny relief," *Harrington*, 562 U.S. at 98, and that "there [was] no

possibility fairminded jurists could disagree that the state court's decision

conflicts with [the Supreme] Court's precedents," *id.* at 102.  When considering

the consistency of the state court decision with Supreme Court precedent, "[t]he

more general the rule, the more leeway courts have in reaching outcomes in case-

by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

Accordingly, in reviewing Fuentes's petition for habeas relief under a

*Brady* claim, we grant the state court "a deference and latitude that are not in

operation when the case involves review under the [*Brady*] standard itself."

*Harrington*, 562 U.S. at 101.  Critically, our review must defer to the decision, *i.e.*,

the substantive conclusion, reached by the state court—not the reasoning it

employed to reach that decision.  Our Circuit adopted this position in 2001,

stating candidly, "[W]e are determining the reasonableness of the state courts'

2

'decision,' not grading their papers." *Cruz v. Miller*, 255 F.3d 77, 86 (2d Cir. 2001) (citation omitted) (quoting 28 U.S.C. § 2254(d)(1)); *accord Cotto v. Herbert*, 331 F.3d 217, 248 (2d Cir. 2003); *see also Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001) ("Nowhere does [§ 2254(d)] make reference to the state court's process of reasoning."). The Supreme Court has reinforced this approach in two cases applying deferential review to state court decisions entirely lacking any explanation of their reasoning. *See Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Harrington*, 562 U.S. at 96–97. Further, in *Premo v. Moore*, decided on the same day as *Harrington*, the Court framed habeas review of a state court's *Strickland* analysis not as whether the state court had properly conducted the analysis but "whether there [was] *any* reasonable argument that counsel satisfied *Strickland*'s deferential standard." 562 U.S. 115, 123 (2011) (emphasis added).[1] Likewise, our sister circuits have overwhelmingly interpreted § 2254 to require deference to the state court's result, not to the presence or the particulars of its reasoning. *See, e.g., Holland v. Rivard*, 800 F.3d 224, 236–37 (6th Cir. 2015); *Makiel*

---

[1] Though *Cruz* left open the possibility that the state court's analysis may be "so flawed as to undermine confidence that the constitutional claim had been fairly adjudicated," 255 F.3d at 86, this dicta cannot survive *Harrington-Premo*, in which the Supreme Court essentially applied the same "any reasonable argument" standard regardless of whether the state court had offered its reasoning (*Premo*) or not (*Harrington*). *See Premo*, 562 U.S. at 123; *Harrington*, 562 U.S. at 102.

*v. Butler*, 782 F.3d 882, 906 (7th Cir. 2015); *Williams v. Roper*, 695 F.3d 825, 831–32 (8th Cir. 2012); *Gill v. Mecusker*, 633 F.3d 1272, 1291–92 (11th Cir. 2011); *Clements v. Clarke*, 592 F.3d 45, 55 (1st Cir. 2010); *Hernandez v. Small*, 282 F.3d 1132, 1140 (9th Cir. 2002); *Neal v. Puckett*, 239 F.3d 683, 696 (5th Cir. 2001); *Bell v. Jarvis*, 236 F.3d 149, 159 (4th Cir. 2000) (en banc); *Aycox v. Lytle*, 196 F.3d 1174, 1177–78 (10th Cir. 1999).[2]

As the majority acknowledges, the availability of writs of habeas corpus in federal court "is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington*, 562 U.S. at 102–03 (internal quotation marks omitted). Therefore, to obtain habeas relief,

> a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well

---

[2] Judge Posner has aptly explained the flaws of a reasoning-focused review:

> [It] would place the federal court in just the kind of tutelary relation to the state courts that the [AEDPA] amendments are designed to end. . . . A federal court in a habeas corpus proceeding cannot remand the case to the state appellate court for a clarification of that court's opinion; all it can do is order a new trial, though the defendant may have been the victim not of any constitutional error but merely of a failure of judicial articulateness.

*Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997).

4

> understood and comprehended in existing law beyond
> any possibility for fairminded disagreement.

*Id.* at 103. This standard is "difficult to meet . . . because it was meant to be"; it is grounded in respect for the State's sovereignty, its "good-faith attempts to honor constitutional rights," and its "significant interest in repose for concluded litigation." *Id*. at 102–03 (internal quotation marks omitted); *accord Burt v. Titlow*, 134 S. Ct. 10, 16 (2013) ("We will not lightly conclude that a State's criminal justice system has experienced the extreme malfunction for which federal habeas relief is the remedy." (alteration and internal quotation marks omitted)). As our Court has explained in the past, "we cannot grant habeas relief where a petitioner's claim pursuant to applicable federal law, or the U.S. Constitution, has been adjudicated on its merits in state court proceedings in a manner that is not manifestly contrary to common sense." *Anderson v. Miller*, 346 F.3d 315, 324 (2d Cir. 2003).

The majority bases its decision in this case on what it identifies as errors in the New York State Court of Appeals majority's reasoning, including misreading of the record of consultation ("ROC"), improperly weighing the trial evidence, and failing to consider the "uniquely important nature of the ROC in these circumstances." Majority Op., *ante*, at 39. But, as discussed above, we are to

5

determine whether there is "any reasonable argument" that the ROC was not material under the *Brady* standard, *Premo*, 562 U.S. at 123, not parse the state court opinion for "deficient reasoning," *Cruz*, 255 F.3d at 86. In other words, we must conclude not only that the suppression of the ROC creates a "'reasonable probability' of a different result" and "undermines confidence in the outcome of the trial," *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)), but that a contrary conclusion would be "so lacking in justification that there was an error well understood and comprehended in existing law *beyond any possibility for fairminded disagreement*." *Harrington*, 562 U.S. at 103 (emphasis added).

The majority attempts to vault over this high barrier on the assertion that G.C.'s psychiatric report is unquestionably material to her motives and credibility—an assertion premised exclusively on the thin straw of two words contained in the ROC: "Dysthymic Disorder," App. 536. By way of overview, dysthymic disorder is "a chronically depressed mood," accompanied by "at least two of the following additional symptoms": "poor appetite or overeating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration or difficulty making decisions, and feelings of hopelessness."

6

DSM-IV, at 345. In other words, a chronically depressed mood is the only symptom that exists in every diagnosis of dysthymic disorder; to make a diagnosis, a doctor must conclude that two (or more) of the other listed symptoms are present, but the specific two may vary among individual cases. Importantly, therefore, the existence of a diagnosis alone does not indicate which of the possible additional symptoms are present.

Furthermore, although "chronic" carries a connotation of severity in common parlance, in the context of dysthymic disorder, it simply means "present for more days than not over a period of at least 2 years." DSM-IV, at 343; *see also Persistent Depressive Disorder (Dysthymia)*, The Mayo Clinic, http://www.mayoclinic.org/diseases-conditions/persistent-depressive-disorder/home/ovc-20166590 (last visited July 11, 2016) (characterizing dysthymia as "a continuous long-term (chronic) form of depression"). Dysthymic disorder is considered "less severe" than "Major Depressive Disorder," which involves episodes of at least two weeks in which the depressive mood is "present for most of the day, nearly every day." DSM-IV, at 343. The DSM-IV estimates that, at any given time, three percent of the population suffers

7

from dysthymia, and another three percent has suffered from it in the past. *See id.* at 347.

The majority's analysis takes the general description of this disorder and runs with it. Without any evidence that G.C. actually experienced any such symptoms, the majority ominously warns that dysthymic disorder "may" also be accompanied by "feelings of inadequacy," "excessive anger," "interpersonal problems," or "distorted self-perception." Majority Op., *ante*, at 31 (internal quotation marks omitted). It then converts generally associated features that "may be" present in people who suffer from this disorder into a conclusion that "G.C. suffered from a chronic disorder *characterized by* low self-esteem, feelings of inadequacy, and excessive anger." *Id.* at 38 (emphasis added). This analytical leap is simply untenable: these symptoms are not part of the "Diagnostic Features" of the disorder, DSM-IV, at 345–46, but instead are part of the DSM-IV's "Associated Features" category, *id.* at 346–47, which is a category describing "clinical features that are frequently associated with the disorder but that are not considered essential to making the diagnosis," *id.* at 8. In other words, the fact that these symptoms *may* appear in individuals with the disorder cannot be extrapolated as characteristics of the disorder for every individual suffering from

dysthymic disorder.[3]   No aspect of the record here indicates that the doctor diagnosed G.C. with these specific associated features; while the ROC mentions that G.C. experienced difficulty with her mother, frequently cried, and was angry at herself "because she went home late and put herself at risk," J.A. 536 (internal quotation marks omitted), these statements are hardly diagnoses of "excessive" anger or systemic "interpersonal problems."

The majority then says, incredibly, that this generic description of the possible associated features of a minor depressive disorder—a disorder that between roughly 4.5 and 9.5 million people will experience this year[4]—"potentially corroborated Fuentes's account of her behavior as 'unstable' and 'erratic' when he declined to see her again, to wit, being angry and volubly upset at being rejected."  Majority Op., *ante*, at 32 (emphasis added).  First, there is simply no connection between the symptoms actually diagnosed in the ROC and this conclusion.  Second, potentially corroborating Fuentes's account is not enough.  To grant habeas relief, the majority has to conclude not only that the

---

[3] It bears repeating that, even of the diagnostic symptoms, only a chronically depressed mood is present in all cases of the disorder and therefore is the only symptom that can be logically extrapolated from the fact of diagnosis alone.

[4] *See* DSM-IV, at 347; *Dysthymic Disorder Among Adults*, National Institute for Mental Health, http://www.nimh.nih.gov/health/statistics/prevalence/dysthymic-disorder-among-adults.shtml (last visited July 11, 2016).

9

suppression of this record "undermines confidence" in the verdict, *Kyles*, 514 U.S. at 434 (internal quotation marks omitted), but also that it does so to such an overwhelming level of objective certainty that no fairminded jurist could disagree, *see Harrington*, 562 U.S. at 102.

Some psychiatric history evidence unquestionably will be so material to witness or victim credibility that the only objectively reasonable conclusion is that its suppression violates *Brady*. This evidence, however, is not in that category. Cases in which courts have held mental health histories so clearly material under *Brady* that habeas relief is warranted—including all the ones on which Fuentes relies—uniformly show a significantly higher severity of diagnosis and a significantly stronger nexus between the nature of the disorder and its effect on the particular witness's credibility. In *Browning v. Trammell*, for example, the psychiatric report described "a severe mental disorder" that made the prosecution's "indispensable witness" "hostile, assaultive, combative, and even potentially homicidal" with a tendency to "blur reality and fantasy and project blame onto others." 717 F.3d 1092, 1106 (10th Cir. 2013); *see also Gonzalez v. Wong*, 667 F.3d 965, 982–84 (9th Cir. 2011) (holding psychiatric reports to be material where they detailed a history of deceitful and manipulative behavior by

10

a witness as well as symptoms of schizophrenia, implicating his "competency to perceive accurately and testify truthfully"). The Third Circuit found a mental health evaluation of an eyewitness showing blackouts, dissociative tendencies, poor judgment, and distorted perceptions of reality to constitute material impeachment evidence. *See Wilson v. Beard*, 589 F.3d 651, 665–66 (3d Cir. 2009); *cf. United States v. Pryce*, 938 F.2d 1343, 1346 (D.C. Cir. 1991) (reversing conviction based on failure to permit cross-examination of an eyewitness on the basis of recent hallucinations). The Ninth Circuit held that the withholding of expert reports on a developmentally disabled victim's ability to understand consent was sufficiently material to warrant habeas relief. *See Bailey v. Rae*, 339 F.3d 1107, 1114–15 (9th Cir. 2003). Into the company of mental health characteristics that are clearly and expressly tied to a critical component of witness credibility, the majority adds "a chronically depressed mood that occurs for most of the day more days than not for at least 2 years." DSM-IV, at 345. One of these things is not like the others.

Despite Fuentes's arguments to the contrary, this case is not analogous to a single-eyewitness case containing a withheld witness statement that the witness "'would not know [the perpetrators] if [he] saw them,'" directly contradicting the

witness's statement on the stand that he had "[n]o doubt" about the defendant's identity, *Smith v. Cain*, 132 S. Ct. 627, 629–30 (2012) (second and third alterations in original) (internal quotation marks omitted). Here, each side presented one corroborating witness: the prosecution presented Tammy Little, who testified that Fuentes had not met G.C. at the arcade as he claimed, and the defense presented a private investigator, who testified that G.C. had told him that the sexual activity was consensual. Though the majority recounts at length ways in which G.C.'s version of events could be attacked, *see* Majority Op., *ante,* at 33–36, these facts were all known to the jury as a basis for contesting G.C.'s testimony. Nothing in the ROC contradicted her testimony, nor did it provide non-speculative evidence that G.C.'s mental state included a propensity to react in an emotionally disturbed or vindictive manner to a one-night stand's refusal to see her again.[5]

Instead, both Fuentes and the majority rely on rampant speculation about symptoms not diagnosed in the psychiatric report in order to claim its materiality. None of the suppositions made about G.C.—that she would become irrational after rejection or that whatever emotional reaction she had would

---

[5] Fuentes's argument that the ROC's reference to frequent crying could have been used to portray G.C.'s tears on the stand as unrelated to her retelling an account of sexual assault, *see* Majority Op., *ante*, at 14, strikes me as far-fetched.

12

manifest in a false accusation of rape—is supported by the record that was before the state court. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."). Although Fuentes appeals to the potential for further investigation by defense counsel, as did the state court dissenters, the record provides no basis to think that further investigation *would*—as opposed to *might*—have uncovered actual symptoms in G.C. supporting Fuentes's characterization of her as emotionally volatile or manipulative. *See Wood v. Bartholomew*, 516 U.S. 1, 6 (1995) (per curiam) (reversing Ninth Circuit's grant of habeas relief on *Brady* grounds "based on mere speculation" that suppressed polygraph results "might have led respondent's counsel to conduct additional discovery that might have led to some additional evidence that could have been utilized").[6] A speculative appeal to possible symptoms—which the excluded document gives us no reason to believe G.C. experienced—is simply not a basis on which to hold a state court's decision "so lacking in justification that there

---

[6] Not until his federal habeas proceeding did Fuentes provide a report by a psychiatric expert—though not the one who examined G.C. in the hospital—suggesting what further investigation might have revealed. Fuentes wisely does not rely on this report on appeal because, in addition to its speculative content, *Cullen* limits our review to the record before the state court, *see* 563 U.S. at 181.

was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

The majority opinion identifies no Supreme Court precedent that squarely addresses psychiatric reports in the *Brady* context, such that finding no materiality here can be truly be called "an unreasonable application of[] clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see also Smith v. Wenderlich*, No. 14-3920, 2016 WL 3457618, at *6 (2d Cir. June 24, 2016) (Kearse, *J.*) ("When there is no Supreme Court holding on a given issue, 'it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law' within the meaning of AEDPA." (alterations in original) (quoting *Carey v. Musladin*, 549 U.S. 70, 77 (2006)). Its only attempt is to cite *Williams [Michael] v. Taylor*, 529 U.S. 420 (2000), a case in which the Court decided the petitioner could not receive an evidentiary hearing on, *inter alia*, his claims of suppression of a psychiatric report. *Williams [Michael]*, however, did not examine the materiality of a psychiatric report; rather, it concerned whether the petitioner had developed the factual basis for his arguments in state court under § 2254(e)(2). *See id.* at 440. It is well established in federal habeas law that we must consider only the holdings, not the dicta, of

14

Supreme Court cases. *See, e.g.*, *Musladin*, 549 U.S. at 74 (citing *Williams [Terry] v. Taylor*, 529 U.S. 362, 412 (2000)). Concluding that *Williams [Michael]* implies the *Brady* materiality of all psychiatric reports is not applying clearly established federal law. Even if the case were about materiality, however, the psychiatric report in *Williams [Michael]* showed severe mental health conditions, possessed by the specific witness and with an indisputable impact on his credibility: the report detailed the main cooperating eyewitness's "little recollection of the [murders], other than vague memories, as he was intoxicated with alcohol and marijuana at the time" and also detailed his post-traumatic stress disorder, major depression, and overwhelming guilt and shame for his participation in the murders. *Williams [Michael]*, 529 U.S. at 438–39 (internal quotation marks omitted). Like the examples from other circuits cited above, there can be no reasonable disagreement that such information about a key eyewitness seriously calls into question the credibility of his testimony. The same cannot be said for the ROC, which itself contains no information tending to impeach G.C.'s testimony or to portray her as emotionally volatile or vindictive. *Williams [Michael]* simply does not create a clearly established rule on the materiality of

psychiatric reports and especially not of those that do not facially impeach witness testimony.

The majority has, in essence, grounded its decision on concerns with what it views to be analytical errors in the Court of Appeals' opinion. But even a clearly erroneous decision does not satisfy the standard for granting the writ. *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). While focusing on whether or not the Court of Appeals accurately analyzed the record, the majority has "all but ignored the only question that matters under § 2254(d)(1)"—namely, "whether it is possible fairminded jurists could disagree that [the state court's decision] [is] inconsistent with the holding in a prior decision of th[e] [Supreme] Court." *Harrington*, 562 U.S. at 102 (internal quotation marks omitted). As a result, the majority has committed the same error for which the Supreme Court criticized the Ninth Circuit in *Harrington*:

> The Court of Appeals appears to have treated the unreasonableness question as a test of its confidence in the result it would reach under *de novo* review: Because the Court of Appeals had little doubt that [the petitioner's] claim had merit, the Court of Appeals concluded the state court must have been unreasonable in rejecting it. **This analysis overlooks arguments that would otherwise justify the state court's result and ignores further limitations of § 2254(d), including its requirement that the state court's decision be**

16

> **evaluated according to the precedents of this Court. It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable.**

*Id.* (emphasis added) (citations omitted).  Given that there is no specific holding from the Supreme Court on psychiatric records under *Brady*, we are left with the highly general *Kyles* standard, which by necessity creates "more leeway . . . in reaching outcomes in case-by-case determinations."  *Yarborough*, 541 U.S. at 664.  A decision that the ROC does not create a reasonable probability of a different verdict is simply not outside of that leeway.

Perhaps it is the prosecutor's intentional decision to exclude the ROC from a purported open-file discovery without disclosing that fact to the defendant or to the court that draws the majority's ire.  It is certainly inexcusable for a prosecutor to represent that everything has been produced when it has not—and even more inexcusable to answer a direct question by the court by detailing G.C.'s various physical examinations in the hospital but omitting the psychological evaluation.  *See* J.A. 177–78.[7]  But—for better or for worse—the

---

[7] Indeed, such conduct could certainly form the basis of professional discipline for ethical violations.  *See* 22 N.Y.C.R.R. § 1200, Rule 3.3(a) ("A lawyer shall not knowingly . . . make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer . . . ."); *id.* Rule 3.4(a)(1) ("A lawyer shall not . . . suppress any evidence that the lawyer or the client has a legal obligation to reveal or produce . . . ."); *id.* Rule 3.8(b) ("A prosecutor . . .

Supreme Court has told us that no greater remedy is available under *Brady* for a prosecutor's intentional violation of constitutional standards than for an inadvertent one. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). Thus, we are bound to the narrow questions of whether the evidence was favorable, suppressed, and material. *See Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014) (en banc). In no universe does a conclusion that this one-page, minimally probative document is not prejudicial under *Brady* constitute an "extreme malfunction[] in the state criminal justice system[]"; instead, the majority has engaged in "ordinary error correction" of the kind we are forbidden by Congress to undertake. *Harrington*, 562 U.S. at 102 (internal quotation marks omitted). And in making just such an error correction, the majority's dissatisfaction with the prosecutor's conduct and the state courts' treatment of the record has led to its misapplication of § 2254(d)(1) and Supreme Court precedent framing the deferential nature of our habeas review.

---

shall make timely disclosure . . . of the existence of evidence or information known to the prosecutor . . . that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the sentence, except when relieved of this responsibility by a protective order of a tribunal."); *id.* Rule 4.1 ("[A] lawyer shall not knowingly make a false statement of fact or law to a third person."). Accordingly, I have directed the Clerk of the Court to forward copies of the majority opinion and this dissent to the Grievance Committee for the Second, Eleventh, and Thirteenth Judicial Districts in the Second Department in order that they may consider whether the prosecutor in this case breached her ethical obligations in a manner warranting professional discipline.

Accordingly, I dissent.